**In re AMERICAN APPAREL, INC. SHAREHOLDER LITIGATION.**

**Case No. CV 10–06352 MMM (RCx).**

United States District Court,
C.D. California.

Jan. 13, 2012.

Arthur J. Chen, Jack G. Fruchter,
Mitchell M.Z. Twersky, Abraham Fruchter

& Twersky LLP, Phillip Kim, The Rosen Law Firm PA, New York, NY, Brian Oliver O'Mara, Danielle S. Myers, Darren J. Robbins, David C. Walton, Robbins Geller Rudman & Dowd LLP, San Diego, CA, Christopher M. Wood, Robbins Geller Rudman & Dowd LLP, Ramzi Abadou, Eli R. Greenstein, Stacey M. Kaplan, Erik David Peterson, Kessler Topaz Meltzer & Check LLP, San Francisco, CA, David E. Bower, Faruqui and Faruqi LLP, Laurence M. Rosen, Rosen Law Firm, Lionel Zevi Glancy, Michael M. Goldberg, Robert Vincent Prongay, Glancy Binkow & Goldberg LLP, Los Angeles, CA, for Anthony Andrade, et al.

Gila D. Jones, Peter Bradley Morrison, Harriet S. Posner, Harriet S. Posner, Skadden Arps Slate Meagher and Flom LLP, Amy J. Longo, Seth A. Aronson, Jennifer H. Cheng, Lindsay Lara Geida, O'Melveny and Myers LLP, Michael G. Freedman, Chet A. Kronenberg, Simpson Thacher & Bartlett LLP, Los Angeles, CA, for American Apparel, Inc.

## ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

MARGARET M. MORROW, District Judge.

This is a consolidated putative securities class action against defendants American Apparel, Inc., Dov Charney, Adrian Kowalewski, and Lion Capital, Inc. Plaintiffs' primary allegation is that during the class period, defendants misled the public about its hiring of workers employed in American Apparel's Los Angeles factory. Plaintiffs allege that defendants hired numerous undocumented workers in violation of the Immigration and Nationality Act ("INA"); that they failed to comply with the INA's reporting requirements; and that they tried to conceal from investors the results of ongoing federal investigations regarding American Apparel's hiring practices. Plaintiffs assert that when American Apparel's misconduct came to light, it was forced to terminate a substantial number of factory workers and that it subsequently misled the public about the effect the staffing reduction would have on the company's bottom line.

Plaintiffs contend that defendants' misrepresentations and omissions violated sections 10(b) of the Securities Exchange Act of 1934 (the "1934 Act") and Securities and Exchange Commission ("SEC") Rule 10b–5 during a class period extending from November 28, 2007 to August 17, 2010. They also contend that defendants Charney, Kowalewski, and Lion Capital violated § 20(a) of the 1934 Act because they were controlling persons of American Apparel.[1] Defendants have moved to dismiss the consolidated class action complaint on several bases. They argue that the complaint fails to plead fraud with sufficient particularity, that it fails to satisfy the heightened requirements for pleading scienter under the Private Securities Litigation Reform Act ("PSLRA"), that some of defendants' statements are protected by the 1934 Act's safe harbor provisions, and that it fails to state a claim under § 20(a) of the 1934 Act.

Defendants ask that, in evaluating their motions to dismiss, the court take judicial notice of numerous SEC filings, American Apparel press releases, news articles, analyst reports and other documents. Plaintiffs oppose a number of these requests.

## I. BACKGROUND AND FACTUAL ALLEGATIONS

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

---

1. Consolidated Class Action Complaint ("Complaint"), Docket No. 66 (Apr. 29, 2011), ¶¶ 157–72.

Procedure, the court's review is limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). All allegations of material fact must be accepted as true and must be construed in the light most favorable to the non-moving party. *ARC Ecology v. U.S. Dep't of Air Force*, 411 F.3d 1092, 1096 (9th Cir.2005); *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002). Accordingly, the court's statement of facts recites and accepts as true the allegations contained in the consolidated class action complaint.[2]

### A. Background on American Apparel, Inc. and the Defendants

American Apparel is a Delaware corporation with its principal place of business in Los Angeles, California.[3] The company manufactures garments and runs wholesale and retail operations throughout the United States and Canada.[4] American Apparel's primary manufacturing plant is located in downtown Los Angeles, in a facility that also houses its executive offices, as well as cutting, sewing, warehousing and distribution operations.[5] The company markets itself to "culturally sophisticated, creative and independent-minded" consumers, who are located primarily in "large metropolitan areas, emerging neighborhoods, and select university communities."[6] The company prides itself on its "pro-labor" policies,

touting the fact that its manufacturing operations are based in the United States in contrast to many other clothing manufacturers.[7] American Apparel's touts its above-market compensation structure, positive working conditions for its employees, and numerous amenities and services it offers its workers.[8] It emphasizes these qualities to take advantage of the increasing importance of workplace conditions and environmental issues in forming consumer buying habits.[9] The company went public in December 2007.[10]

Dov Charney is American Apparel's founder; during the class period, he was the company's President, CEO, and Chairman of the Board.[11] Charney founded American Apparel and served as director, President, and CEO of its predecessor corporation. Charney has "long been outspoken about immigration and labor reform,"[12] and has specifically advocated amnesty for undocumented workers.[13] It is reported that on one occasion Charney said that amnesty was "at the core of [his] company, at the core of [his] soul."[14]

Adrian Kowalewski was American Apparel's Executive Vice President and Chief Financial Officer ("CFO") during the relevant time period. He also served as a director of the company.[15] Kowalewski started at the company as an intern in 2006, and was ultimately promoted to Director of Corporate Financing and Devel-

---

**2.** Plaintiffs' complaint is 86 pages long and contains 188 numbered paragraphs.

**3.** Complaint, ¶ 44.

**4.** *Id.*, ¶ 63.

**5.** *Id.*

**6.** *Id.*, ¶ 64 (quoting the company's SEC filings).

**7.** *Id.*, ¶ 6.

**8.** *Id.*

**9.** *Id.*

**10.** *Id.*, ¶ 11.

**11.** *Id.*, ¶ 45.

**12.** *Id.* ¶ 8.

**13.** *Id.*

**14.** *Id.* ¶ 9.

**15.** *Id.* ¶ 46.

opment.[16] He served as CFO of the company from late 2008 to February 2011, when he was replaced by John J. Luttrell.[17]

Lion Capital is a limited liability partnership with a registered office in London, England.[18] The partnership has a New York-based American affiliate, and is purportedly a "recognized leader in investing in consumer businesses." [19] The partnership was founded by Lyndon Lea, Neil Richardson, and Robert Darwent.[20] Lion Capital loaned American Apparel approximately $80 million in March 2009; in return, it was given two board seats and the right to designate one "Board Observer." The role and responsibilities of the observer are not clearly delineated in the complaint.[21] At various times during the class period, Lea, Richardson, and Jacob Capps were simultaneously partners of Lion Capital and members of American Apparel's board.[22] On May 12, 2010, Capps resigned from the Board, but remained as Board Observer.[23] On March 30, 2011, Capps resigned as Board Observer, and Lea and Richardson resigned from the board, all citing "conflicts of interest." [24]

## B. Defendants' Allegedly False and Misleading Statements During the Class Period

Plaintiffs' allegations regarding defendants' false statements and scienter concern three primary issues. First, plaintiffs allege that although American Apparel touted its progressive labor policies and represented that the company was in full compliance with U.S. immigration laws, a substantial portion of the company's manufacturing employees were not authorized to work in the United States. Plaintiffs assert that Charney and other defendants knew this fact during the class period, and materially misrepresented American Apparel's compliance with the immigration laws. Ultimately, U.S. Immigration and Customs Enforcement ("ICE") commenced an investigation regarding the company's hiring and retention practices. The investigation eventually resulted in the termination of 1,800 individuals, or more than one-third of the company's Los Angeles-based manufacturing workforce.[25]

Second, plaintiffs allege that during the class period, defendants misrepresented the seriousness of the workforce reduction's effect. Plaintiffs allege that because of the company's structure and the individual defendants' personal and intimate knowledge of its operations, defendants knew that terminating so many employees would have a significant adverse impact on American Apparel's ability to maintain its inventory levels, which in turn would affect its profitability. They assert that defendants nonetheless minimized the effect of the work force reduction, claiming that excess inventory and a backlog of employment applications would blunt the impact of the terminations.

Third, plaintiffs allege that American Apparel and the individual defendants repeatedly misrepresented the company's financial health not only to investors via conference calls, press releases, and SEC filings, but also to the company's independent auditors. Plaintiffs assert that defen-

16. *Id.* ¶ 26.

17. *Id.*

18. *Id.* ¶ 153.

19. *Id.*

20. *Id.*

21. *Id.* ¶¶ 116–17.

22. *Id.,* ¶ 53.

23. *Id.,* ¶ 117.

24. *Id.*

25. *Id.* ¶ 13.

dants, while repeatedly affirming the strength of American Apparel's internal controls and its commitment to conservative financial practices, misled the public and its own auditors about the myriad problems the company was experiencing during the class period. The specific facts supporting these allegations are set forth below.

### 1. American Apparel's Employment of Unauthorized Workers

The complaint alleges that the class period began on November 28, 2007, the date American Apparel filed a Proxy Statement with the Securities and Exchange Commission ("SEC") in preparation for an initial public offering.[26] The Proxy Statement was filed on an SEC Form 14–A and included disclosures about the company's then-existing employees, specifically that they were all "documented immigrants, authorized to work in the United States."[27] The Proxy Statement also "highlighted the Company's heavy dependence on migrant labor and acknowledged that maintaining its foreign workforce was critically important to the Company's manufacturing capabilities, operations, and financial results."[28] It stated:

> "Changes to existing U.S. immigration laws or labor laws could affect this labor force and could make it harder for members of such force to remain or legally work in the United States. Any changes in U.S. laws having such an [e]ffect could make it harder for American Apparel to maintain and expand its

work force, which would be adverse to American Apparel's manufacturing capabilities and harm American Apparel's operations and financial results."[29]

Approximately one month later, on December 21, 2007, the company went public.[30]

In January 2008, American Apparel received notice that ICE was conducing an audit of its records to ensure compliance with the immigration laws.[31] On March 17, 2008, the company filed its 2007 Form 10–K stating that it was making "diligent efforts to comply with all employment and labor regulations, including immigration laws."[32] It was only when the company filed its first quarter 2008 Form 10–Q that it disclosed the ICE investigation; this was some four months after the company received notice of the investigation.[33]

The company's representatives took a hard public stance against the federal government's enforcement actions. Specifically, on April 30, 2008, American Apparel's attorney Peter Schey stated that the company would "come down like a ton of bricks" on ICE if the agency and other law enforcement officials raided the company's facilities.[34] Schey represented that all of the company's employees were "legal to the best of his knowledge," although he admitted that immigration authorities were investigating the matter.[35] On May 16, 2008, Charney reaffirmed his commitment to immigration reform and amnesty for undocumented immigrants, observing that Los Angeles's "economy as a whole is

26. *Id.,* ¶ 71.

27. *Id.,* ¶ 71.

28. *Id.,* ¶ 72.

29. *Id.*

30. *Id.,* ¶¶ 62. Charney took American Apparel public via a "reverse merger" with Endeavor, a company that was formed mainly to acquire an operating business. (*Id.,* ¶ 58.)

31. *Id.,* ¶ 72.

32. *Id.,* ¶ 73. The complaint notes that the "Company filed its 2007 Form 10–K with the SEC on Form 14–A." (*Id.*)

33. *Id.,* ¶ 72.

34. *Id.,* ¶ 75.

35. *Id.*

deeply dependant on immigrant labor," and that forcing local industries to move offshore because of increased enforcement activities would result in "irreparable" damage.[36]

Although the company allegedly had some hope that the Obama administration would secure passage of an immigration reform bill that included a path to legalization for at least some undocumented immigrants, by April 2009 it had become clear that reform would not occur in the immediate future.[37] By the end of that month, the administration had articulated a new enforcement strategy designed to target employers who knowingly hired unauthorized workers and encourage companies to comply with the immigration laws.[38]

On June 30, 2009, American Apparel filed a Form 8–K without an accompanying press release.[39] The Form 8–K stated that on June 24, 2009, ICE notified American Apparel that it could not verify the employment eligibility of "approximately 200 current employees because of discrepancies in the[ ] employees' records." In addition, ICE stated that another 1,600 employees "appear[ed] not to be authorized to work in the United States and appear[ed] to have obtained employment by providing, on Form I–9, documentation which ICE believes ... to be suspect and not valid."[40] On July, 1, 2009, the company issued a press release concerning its Form 8–K, which revealed that many of the individuals mentioned in ICE's investigative report had "worked at American Apparel for as long as a decade."[41] The

release attempted to reassure investors that the loss of so many workers would not materially affect the company because it would "only need to hire for a fraction of those employees that would be terminated."[42] The release also stated that American Apparel had a significant backlog of job applications.[43] It reported that

> "even if the Company were to lose substantially all of the 1,800 identified employees (which represent approximately one-third of the 5,600 employees the Company currently employs in its manufacturing operations in the Los Angeles area), the Company does not presently believe that the loss of employees would have a materially adverse impact on its financial results.... The Company believes that its current surplus levels of inventory and manufacturing capacity will mitigate the adverse impact of any disruption to its manufacturing activities that may potentially result from the loss of these employees."[44]

The June 2009 Form 8–K stated that it was American Apparel's policy "at all times, to fully comply with its obligations to establish the employment eligibility of prospective employers under immigration laws."[45] Despite these assurances, American Apparel's stock price fell 16 percent between June 30, 2009, and July 2, 2009.[46]

On August 13, 2009, American Apparel had an earnings call with analysts and investors.[47] Kowalewski said although it was "difficult to estimate what the impact [of the ICE investigation] would be on [the

**36.** *Id.,* ¶ 76.

**37.** *Id.* ¶ 79.

**38.** *Id.*

**39.** *Id.* ¶ 80.

**40.** *Id.*

**41.** *Id.* ¶ 81.

**42.** *Id.*

**43.** *Id.*

**44.** *Id.* ¶ 82.

**45.** *Id.,* ¶ 183.

**46.** *Id.* ¶ 181.

**47.** *Id.* ¶ 92.

company's] results, [American Apparel] didn't believe it would have a material impact, given the fact that [it] had effectively hired significant amounts of people at the end of Q2 '08." [48] Kowalewski reported that the company had "more labor than was really justified by the amount of business" it was conducting given the economic decline, and that the "way [it] would mitigate [the loss of employees] would be by increasing the days per week of [existing] employees ... [which] would virtually pick up all of the reduction in labor that [it] might see if we had a loss in workers." [49] He also stated that while American Apparel did not "have an update on what the financial impact would be," he suggested that the company "would ... reiterate what [it had] said at the beginning of July"-that the impact of the loss of employees was "difficult to estimate," but should not be "material." [50] Charney participated in this call; he said that American Apparel was "set up to do more business than [it had been] doing," and that was positioned to "get to those double-digit margins" when "the economy [came] back." [51]

On September 3, 2009, the *Los Angeles Times* quoted Schey as saying that "[w]e do not anticipate [the immigration violations] will have a significant impact on American Apparel's productivity because of the confluence of several factors including the slow economy and high preexisting inventory levels." [52] On September 30,

2009, *The New York Times* quoted Schey was in an article that reported the alleged firing of 1,800 American Apparel employees. [53] It stated that Schey reported that ICE had cited "deficiencies in the company's record keeping," but that it had withdrawn a threatened fine against the company. [54] In a Form 10–Q later filed with the SEC less than two weeks later, however, the company noted that it had indeed been fined by ICE. [55] Schey told another newspaper more than a year later that he had been "misquoted" by *The New York Times;* the company, however, did not seek a retraction of the statement at the time the article appeared. [56]

In October 2009, American Apparel admitted that it had dismissed approximately 1,500 employees due to discrepancies in their immigration documentation. [57] That month, Charney also lashed out in anger about immigration reform in general, venting his anger in a blog post. [58]

On November 10, 2009, the company held another earnings conference call. Kowalewski said that "the efficiency [of the workforce was] probably pretty comparable" to what it had been prior to the terminations. Charney noted that the transition to new workers had been "virtually seamless." [59] On March 25, 2010, the company issued a press release concerning its year-end financial results, which addressed the workforce reduction's effect on the corporation. [60] American Apparel also held a conference call where the impact of

48. *Id.*

49. *Id.*

50. *Id.*

51. *Id.,* ¶ 93.

52. *Id.,* ¶ 96.

53. *Id.,* ¶ 99.

54. *Id.*

55. *Id.*

56. *Id.* at n. 15.

57. *Id.,* ¶ 70.

58. *Id.*

59. *Id.,* ¶ 100.

60. *Id.,* ¶ 102.

the reduction was mentioned.[61] Charney acknowledged that the company's "biggest problem ha[d] been employee productivity," noting that American Apparel had "lost some of [its] best people." [62] Over the next two days, the company's stock price fell more than 22.7 percent.[63]

On May 19, 2010, the company issued a preliminary report on its first quarter 2010 earnings in a press release. The release stated that there had been a "significant drop in [the company's] gross margin due, in part to 'reduced labor efficiency.' " [64] It also reported that the workforce reduction had resulted in "reduced manufacturing efficiency at the company's production facilities" beginning in the fourth quarter of 2009, and that the reduction "could impact the company's financial results at least through early 2011." [65] On a conference call that same day, Charney said:

> "We didn't move quickly enough after the immigration intervention.... We should have been hiring more people.... We are off our game but we are going to get back on our game as far as-in a way the fact that we had this Made in USA factory we are not getting the full benefit of it because actually we don't have enough people." [66]

The day the press release issued and the conference call occurred, American Appar-el's stock price plunged 40.51 percent on "unusually heavy" trading volume.[67] Since that day, the company has had no conference calls with analysts or investors.[68]

## 2. Defendants' Alleged Knowledge of the Effect of the Staffing Reduction

Plaintiffs allege that during most, if not all, of the class period, American Apparel knew that many of its employees were not authorized to work in the United States.[69] They assert that under the INA, employers can only hire persons who are legally authorized to work in the United States, and must verify employment eligibility using an I–9 form.[70] This form requires that employers review and record a prospective employee's identity documents and determine whether the documents reasonably appear to be genuine.[71] The employer must retain the I–9 form for at least three years or one year after the end of the worker's employment, whichever is longer.[72] On its website, ICE notes that "diligent hiring practices" include a range of other procedures, including the use of E–Verify, a federal employment eligibility verification program.[73] It encourages the adoption of internal controls and policies to assist in ensuring that workers are eligible for employment in this country.[74]

---

61. *Id.,* ¶ 103.

62. *Id.*

63. *Id.* The complaint cites news reports shortly after the stock price dropped that highlighted some of the discrepancies between the company's current representations, and its more optimistic projections in the past. (*Id.,* ¶¶ 103–04.)

64. *Id.,* ¶ 105.

65. *Id.*

66. *Id.,* ¶ 106.

67. *Id.,* ¶ 107.

68. *Id.*

69. *Id.,* ¶ 65.

70. *Id.*

71. *Id.*

72. *Id.*

73. *Id.,* ¶ 67.

74. *Id.* In addition to the use of E–Verify, these controls include:

> "(ii) use the Social Security Number Verification Service ("SSNVS") for wage reporting purposes. Make a good faith effort to correct and verify the names and Social Security numbers of the current workforce

As evidence that American Apparel knew it had hired ineligible workers, plaintiffs cite Charney's statement on April 11, 2006, prior to the commencement of class period, that if any apparel company failed to support legalization for undocumented immigrants, it would be "cut[ting] [its] nose off to spite [its] face."[75] They also note Charney's speculation in the *Los Angeles Times* that "over 50% of the workers in [the apparel] industry are falsely documented";[76] Charney's comment in 2006 that it "doesn't matter what the documents say," and that he did not "believe in any restrictions on exit or entry to the United States";[77] and Charney's statement to *The Guardian* in January 2006 that he had "visuality [sic] to what's going on in my stores every night, every day of the week. Right here and now."[78] They allege that Charney repeatedly called workers part of his "family."[79]

The complaint also alleges a specific instance reported by a former American Apparel customer service representative, who worked at the downtown Los Angeles factory from late 2004 to May 2010.[80] The former employee reported that a new customer service employee had been hired whom Charney had met on the street.[81] The new employee did not speak English and was "scantily clothed" when she showed up for work.[82] she was later transferred to the shipping department.[83]

Plaintiffs assert that American Apparel knowingly deceived the public about the effect the workforce reduction would have on its operations and profitability. They cite the Proxy Statement filed in November 2007, which acknowledged that shifts in immigration or labor laws could affect the ability of American Apparel workers to "remain or legally work in the United States," and that "[a]ny changes in U.S. laws having such an [e]ffect could make it harder for American Apparel to maintain and expand its work force, which would be adverse to American Apparel's manufacturing capabilities and harm [its] operations and financial results."[84] Plaintiffs also cite a number of statements Charney made during the class period about employee training. During a May 13, 2008 investor call, for example, Charney stated

and work with employees to resolve any discrepancies; (iii) establish a written hiring and employment eligibility verification policy; (iv) establish an internal compliance and training program related to the hiring and employment verification process, including completion of Form I–9, how to detect fraudulent use of documents in the verification process, and how to use E–Verify and SSNVS; (v) require the Form I–9 and E–Verify process to be conducted only by individuals who have received appropriate training and include a secondary review as part of each employee's verification to minimize the potential for a single individual to subvert the process; (vi) arrange for annual Form I–9 audits by an external auditing firm or a trained employee not otherwise involved in the Form I–9 process; (vii) establish a procedure to report to ICE credible information of suspected criminal misconduct in the employment eligibility verification process; and (viii) establish a tip line mechanism (inbox, e-mail, etc.) for employees to report activity relating to the employment of unauthorized workers, and a protocol for responding to credible employee tips. (*Id.*)"

75. *Id.*, ¶ 77.

76. *Id.*, ¶ 78.

77. *Id.*, ¶ 72.

78. *Id.*, ¶ 98.

79. *Id.*, ¶ 71.

80. *Id.*, ¶ 70.

81. *Id.*

82. *Id.*

83. *Id.*

84. *Id.*, ¶ 72.

that "swallowing ... a lot of new workers" would "take a bit of a toll on the business." [85] During a November 10, 2008 call, he said that "it takes years [to] train[ ] these people.... Absorbing all the new workers is an issue." [86] Charney also made statements indicating that he kept close track of inventory amounts and trends.[87]

Plaintiffs allege that later, defendants admitted the full extent of the workforce reduction's impact on American Apparel's bottom line. On March 25, 2010, defendants acknowledged that the terminations had had a "substantial" impact, and that the "extended disruption o[f] [American Apparel's] operations ha[d] been unprecedented." [88] On October 29, 2010, Charney told *The Globe and Mail* that the reduction had "broke[n] [American Apparel's] efficiencies and generated a situation where [it was] late delivering garments. It lost [the company] an enormous amount of money." [89]

### 3. American Apparel's Accounting Practices and Internal Controls

Plaintiffs allege that during the relevant period, and contrary to Charney's and Kowalewski's representations, American Apparel's finances and internal controls were in utter disarray. As noted, American Apparel went public by merging with a

public company; as a result, it had to comply immediately with SEC regulations and standards.[90]

On March 17, 2008, a few months after American Apparel went public, Kowalewski assured investors that "[a] big focus for us in 2008 as a public company is going to be remediating these material weaknesses [in accounting procedures] so we can get into compliance with Sarbanes–Oxley." [91] On March 20, 2008, Charney stated in an interview with *The Wall Street Journal* that his then-CFO, Ken Cieply, had "no credibility" and was a "complete loser," among other aspersions.[92] Charney reversed course the next day and apologized for his comments.[93] Less than two months later, during a May 2008 conference call with investors, Charney said he wanted to build a "world-class financial team" and affirmed the company's commitment to a "strict corporate orthodoxy as far as financial accounting issues." [94] Charney reiterated some of these statements during a subsequent August 14, 2008, conference call, in which he stated that "[o]verall[,] SOX implementation [was] on track." [95] During a November 10, 2008, investor call, Charney said he was "confident in the numbers [American Apparel had] put out there," and assured investors that the company was financially healthy.[96] During the same call, Kowalewski told investors that American Apparel's internal controls

---

**85.** *Id.,* ¶ 90.

**86.** *Id.*

**87.** *Id.,* ¶ 98.

**88.** *Id.,* ¶ 101.

**89.** *Id.* Plaintiffs cite several news articles from the Spring of 2010, which note the fact that Charney's initial statements regarding the impact of the workforce reduction were different than his statements in November 2008. (*Id.,* ¶¶ 103–04.)

**90.** *Id.,* ¶ 108. Plaintiffs allege that, by contrast, a company that goes public via an ini-

tial public offering is given a year to comply. (*Id.,* ¶ 109.)

**91.** *Id.,* ¶ 10.

**92.** *Id.,* ¶ 25.

**93.** *Id.*

**94.** *Id.,* ¶ 27.

**95.** *Id.,* ¶ 111.

**96.** *Id.,* ¶ 30.

progress was still on track, stating, "[o]n the Sarbanes–Oxley front, we continue to be on track and continue to expect to demonstrate significant progress intermediating deficiencies by year[-]end." [97]

Less than two months later, on January 7, 2009, CBS reported that on December 24, 2008, Kowalewski had sent a series of emails to American Apparel's head of public relations.[98] The *Los Angeles Times* eventually obtained a copy of the emails and ran an article on March 14, 2009, disclosing their contents.[99] In the emails Kowalewski reportedly made such statements as "We almost went bankrupt last Friday" and "I've been sick and occupied with other company matters since Friday because we're hardly out of the woods on [the near-bankruptcy]." [100] Notably, at the end of December 31, 2008, Kowalewski replaced Cieply as chief operating officer.[101]

On March 17, 2009, as these news reports were emerging, the company held another investor call during which Charney stated that the company "fe[lt] [its] brand and the market segment [it] serve[d] [would] allow [it] to weather the economic storm well." [102] Charney again assured investors that during 2008, American Apparel was "able to build out [its] finance and accounting team and improve[ ][its] controls and systems"; plaintiffs assert that Charney misleadingly touted Kowalewski's promotion to CFO, stating that Kowalewski's "knowledge of the workings of our unique Company, his

work ethic and work in building our team and our internal financial capabilities over the past year made him the absolute best choice for that position." [103]

Analysts reacted positively to Charney's statements, noting American Apparel's performance in an economic downturn. A KeyBanc Capital Markets report dated April 22, 2009 highlighted the fact that the firm was "[c]ommitted to best practices," and reported that Charney had emphasized its commitment to conservatism.[104] The report stated that Charney had made these comments in response to a direct inquiry regarding what American Apparel's "management view[ed] as a Street misperception about the Company." [105]

This time period also marked the beginning of American Apparel's relationship with Lion Capital. In a news release on March 13, 2009,[106] and a Form 8–K press release dated March 16, 2009, American Apparel announced that it had entered into a private financing agreement with Lion Capital involving more than $80 million in secured second lien notes, which was designed to provide the company with much-needed capital.[107] The Lion Financing Agreements gave Lion Capital the right to designate two members of American Apparel's Board, as well as a "Board Observer." [108] In a press release, Charney asserted that Lion Capital's investment gave the company "a long term solution for [its] capital structure and an enhanced ability to grow [its] brand both domestically and internationally over the coming years." [109]

97. *Id.*, ¶ 113.

98. *Id.*, ¶ 28.

99. *Id.*

100. *Id.*, ¶ 29.

101. *Id.*, ¶ 26.

102. *Id.*, ¶¶ 32–33.

103. *Id.*, ¶ 114.

104. *Id.*, ¶ 31.

105. *Id.*, ¶ 120.

106. *Id.*, ¶ 119.

107. *Id.*, ¶ 116.

108. *Id.*, ¶ 117.

109. *Id.*, ¶ 119.

Plaintiffs allege, in contrast, that "[w]ith Lion Capital's significant financial interest in the Company and its own Partners serving on the Company's Board, Lion Capital had the power to control the Company's management and policies at two critical junctures during the Class Period." [110]

During a May 18, 2009 analyst call, "[t]he Company . . . announced [the] April [2009] . . . appointment of a new independent auditor [Deloitte], and [the fact that it had] completed a full quality of earnings review with Lion Capital's accountants at KPMG." [111] The May 18, 2009 press release mentioned that the Company "might" have to restate its fiscal year 2008 financial statements, which it did later that month. [112]

During its review, Deloitte learned that on March 16, 2009 (the same day American Apparel filed its 2008 Annual Report), it notified investors in a separate filing that on March 13, 2009, it had refinanced its "long-term" debt by obtaining an $80 million credit facility from Lion Capital. [113] It confirmed the fact that a restatement of financials was necessary to investors two months later, on July 23, 2009. [114]

On May 19, 2010, the Company issued an earnings press release, which stated it was likely to be in default on June 30, 2010, and that this "would have a material adverse impact on the Company's operations which would result in the need for the Company to modify its current business plan and/or curtail its operations and [which] could affect the Company's ability to continue operations as a going concern." [115]

Despite this fact, Deloitte signed an audit opinion on March 31, 2010, less than two months earlier, that failed to include any "going concern" language. [116] Plaintiffs allege that an auditor is responsible for including such language in the audit report if it believes it is "reasonably possible" that the audited company will go bankrupt within 12 months of the date of the audited financial statement. [117]

On July 22, 2010, Deloitte resigned as American Apparel's auditor; the company announced the resignation publicly on July 28, 2010 in a Form 8–K filing. [118] It stated that "Deloitte [had] advised the Company that certain information ha[d] come to [its] attention[ ] that if further investigated [might] materially impact the reliability of either its previously issued audit report or the underlying consolidated financial statements for the year ended December 31, 2009 included in the Company's 2009 Form 10–K." [119] In response to this news, American Apparel's stock declined 14.36 percent, to $1.55, on heavy trading. [120]

Deloitte resigned because, in its words, it was "no longer willing to rely on management's representations [given its] belief that management [had] withheld from [it] the February 2010 monthly financial statements until after the filing of the 2009 Annual Report and [had] made related misrepresentations." [121] Analysts reacted

---

110. *Id.,* ¶ 118.

111. *Id.,* ¶ 121.

112. *Id.*

113. *Id.*

114. *Id.*

115. *Id.,* ¶ 123.

116. *Id.*

117. *Id.* (citing PCAOB § 341.02–03, The Auditor[']s Consideration of An Entity's Ability to Continue as a Going Concern).

118. ¶¶ 34, 126.

119. *Id.,* ¶ 126.

120. *Id.*

121. *Id.,* ¶ 127.

strongly to the news. KeyBanc Capital Markets moved its rating of American Apparel's stock from "Buy" to "Not Rated"; it noted that while the revelation did "not necessarily imply any degree of misstatement, it certainly raise[d] an already high risk profile."[122] News reports observed that the Deloitte announcement had had a significantly negative effect on American Apparel's stock price.[123]

On August 17, 2010, the last day of the class period, American Apparel made a number of additional disclosures. First, it announced a preliminary report on its second quarter 2010 financial results, which stated:

> "Gross margin for the second quarter of 2010 is expected to be in the range of 50% to 52%, as compared to 59.0% for the prior year second quarter. Gross margin was negatively impacted by a shift in mix from retail to wholesale net sales, which generate lower margins, and by lower labor efficiency at the Company's production facilities in the second quarter of 2010 compared to the prior year period. The lower labor efficiency was primarily a result of the hiring of over 1,600 net new manufacturing workers during the second quarter of 2010, as well as the impact of an increase in the mix of more complex retail styles produced. Loss from operations for the second quarter of 2010 is expected to be in the range of $5 million to $7 million, as compared to income from operations of $7.3 million in the second quarter of 2009...."

> "The Company expects to report a substantial loss from operations and negative cash flows from operating ac-

tivities for the six months ended June 30, 2010. Based on this, and trends occurring in the Company's business after the second quarter and projected for the remainder of 2010, the Company may not have sufficient liquidity necessary to sustain operations for the next twelve months. The Company's current operating plan indicates that losses from operations are expected to continue through at least the third quarter of 2010. These factors, among others, raise substantial doubt that the Company will be able to continue as a going concern."[124]

American Apparel also reported that the United States Attorney's Office for the Southern District of New York had issued a grand jury subpoena to the company on July 30, 2010, requiring the production of documents related to the circumstances surrounding Deloitte's resignation and a related SEC inquiry.[125] In November 2010, it was revealed that the United States Attorney's Office for the Central District of California had issued a subpoena in a criminal investigation concerning into Deloitte's resignation and the Company's financial reporting and internal controls, and that the SEC had issued subpoena related to a formal investigation as well.[126] Plaintiffs allege that these investigations are ongoing.[127]

During the two days following these disclosures, American Apparel's stock price fell approximately 46 percent on heavy trading, from $1.39 per share to just over $0.75 per share.[128]

### 4. Post–Class Period Developments

On August 18, 2010, *WWD* reported, following an interview with Charney, that

---

122. *Id.*

123. *Id.,* ¶ 128.

124. *Id.,* ¶ 129.

125. *Id.,* ¶ 130.

126. *Id.*

127. *Id.*

128. *Id.,* ¶ 131.

he "traced most of the [company's] current [financial] problems back to difficulties at the firm's Los Angeles factory, which hired 1,600 new workers in the second quarter."[129] "Charney reportedly acknowledged that '[r]eplacing the workers that we lost in [our] L.A. factory was far more difficult than [he had] anticipated.'" He noted that "'because the consumer [had been] battered, having the right product at the right time at the right place [was] more important than ever,'" and conceded that American Apparel had been unable to "'respond quickly enough because of [the] issues with the factory.'"[130]

On February 7, 2011, American Apparel filed what plaintiffs denominate "an unusual amendment" to its 2009 Annual Report. It was the company's fourth amendment of the 2009 Annual Report. Plaintiffs allege that the amended 2009 Annual Report was filed to provide investors with "unaudited" financial statements for the year ended December 31, 2009 that had previously been filed as "audited." It included an "Explanatory Note" denying that the amendment was an admission of any mistakes or untrue statements in prior filings.[131]

On March 31, 2011, American Apparel filed its 2010 Annual Report. It stated that Deloitte had alleged misrepresentations by management

"based on the significance of the declines in operations and gross margin in the Company's February 2010 monthly financial statement, combined with the January 2010 monthly financial statements, the Company's issuance of revised projections in early May 2010

which reflected a significant decrease in the Company's 2010 projections, and [Deloitte]'s disagreement with the Company's conclusion that the results shown in the February 2010 monthly financial statements would not have required a revision to the Company's projections as of the date of the 10–K filing and the issuance of [Deloitte]'s reports. [Deloitte] further indicated that [it was resigning due to its] inability to perform additional audit procedures ... and [its] professional judgment that [it was] no longer willing to rely on management's representations due to [Deloitte]'s belief that management withheld from [Deloitte] the February 2010 monthly financial statements until after the filing of the 2009 10–K and made related misrepresentations.

"The Audit Committee and the Company's management are currently evaluating these matters. The Audit Committee of the Company has commenced an investigation into the assertions that management withheld the February 2010 monthly financial statements and related misrepresentations."[132]

On April 1, 2011, the two Lion Capital members sat on American Apparel's board resigned from their positions, citing "conflicts of interest."[133] American Apparel also went back to Lion Capital on October 1, 2010, in order to restructure its credit agreement or face possible bankruptcy.[134]

### C. The Litigation

Multiple shareholders initiated lawsuits against American Apparel. On December 3, 2010, the court ordered consolidation of the cases.[135] On March 15, 2011, the court

---

**129.** *Id.,* ¶ 132.

**130.** *Id.*

**131.** *Id.,* ¶ 133.

**132.** *Id.,* ¶ 134.

**133.** *Id.,* ¶ 38.

**134.** *Id.,* ¶ 119.

**135.** Order Approving Stipulation Regarding Consolidation of Cases, Docket No. 25 (Dec. 3, 2010).

granted Charles Rendelman's motion for appointment as lead plaintiff.[136]

On April 29, 2011, Rendelman filed a consolidated class action complaint.[137] American Apparel, Lion Capital, Charney and Kowalewski have filed motions to dismiss the complaint, accompanied by requests for judicial notice.[138] Plaintiffs filed an omnibus opposition to defendants' motions on June 30, 2011;[139] defendants filed replies on July 14, 2011.[140]

## II. DISCUSSION

### A. Legal Standard Governing Motions To Dismiss Under Rule 12(b)(6)

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988). In deciding a Rule 12(b)(6) motion, the court generally looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir.2002); *Hal Roach Studios, Inc. v.* *Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n. 19 (9th Cir.1990).

The court must accept all factual allegations pleaded in the complaint as true, and construe them and draw all reasonable inferences from them in favor of the non-moving party. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"); see also *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir.1996); *Mier v. Owens*, 57 F.3d 747, 750 (9th Cir.1995). The court need not, however, accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. See *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of

**136.** Order re: Motions for Appointment as Lead Plaintiff and Lead Counsel, Docket No. 59 (Mar. 15, 2011).

**137.** Complaint.

**138.** Defendant American Apparel's Motion to Dismiss ("American Apparel MTD"), Docket No. 73 (May 31, 2011); Request for Judicial Notice by Defendant American Apparel, Inc. ("American Apparel RJN"), Docket No. 74 (May 31, 2011); Motion to Dismiss by Defendants Dov Charney, Adrian Kowalewski ("Charney/Kowalewski MTD"), Docket No. 76 (May 31, 2011); Defendant Lion Capital's Motion to Dismiss ("Lion Capital MTD"), Docket No. 77 (May 31, 2011); Request for Judicial Notice in Support of Lion Capital's Motion to Dismiss ("Lion Capital RJN"), Docket No. 78 (May 31, 2011).

**139.** Memorandum in Opposition to Motion to Dismiss Case ("Opp."), Docket No. 84 (June 30, 2011); Opposition to Request for Judicial Notice ("RJN Opp."), Docket No. 85 (June 30, 2011); Request for Judicial Notice by Charles Rendelman ("Plaintiffs' RJN"), Docket No. 86 (June 30, 2011).

**140.** Reply in Support of Motion to Dismiss ("Lion Capital Reply"), Docket No. 88 (July 14, 2011); Reply in Support of Motion to Dismiss ("Charney/Kowalewski Reply"), Docket No. 89 (July 14, 2011); Reply in Support of Motion to Dismiss ("American Apparel Reply"), Docket No. 90 (July 14, 2011); Reply in Support of Request for Judicial Notice ("American Apparel RJN Reply"), Docket No. 91 (July 14, 2011); Reply in Support of Request for Judicial Notice ("Lion Capital RJN Reply"), Docket No. 92 (July 14, 2011).

action will not do'"). Thus, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' ... A claim' has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009); see also *Twombly*, 550 U.S. at 545, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)" (citations omitted)); *Moss v. United States Secret Service*, 572 F.3d 962, 969 (9th Cir.2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief," citing *Iqbal* and *Twombly* ).

## B. Requests For Judicial Notice

■ Both plaintiffs and defendants have asked that the court take judicial notice of various documents. Because Rule 12(b)(6) review is confined to the complaint, the court typically does not consider material outside the pleading (e.g., facts presented in briefs, affidavits, or discovery materials). *In re American Continental Corp./Lincoln Sav. & Loan Securities Litig.*, 102 F.3d 1524, 1537 (9th Cir. 1996). It may, however, properly consider exhibits attached to the complaint and documents whose contents are alleged in the complaint but attached, if their authenticity is not questioned. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.2001).

In addition, the court can consider matters that are proper subjects of judicial notice under Rule 201 of the Federal Rules of Evidence. *Id.* at 688–89; *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994), overruled on other grounds by *Galbraith v. County of Santa Clara*, 307 F.3d 1119 (9th Cir.2002); *Hal Roach Studios, Inc.*, 896 F.2d at 1555 n. 19; see also *Tellabs*, 551 U.S. at 322, 127 S.Ct. 2499 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").[141] The court is "not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing Inc.*, 143 F.3d 1293, 1295 (9th Cir.1998).

### 1. SEC Filings

Plaintiffs and defendants first ask that the court take judicial notice of several of American Apparel's SEC filings and of an SEC Investor Bulletin.[142] The filings include the company's Forms 10–K, 10–Q, and 8–K, Endeavor Acquisition Corp.'s Form 14–A, and Charney's Schedule 13D/A. They also seek judicial notice of the transcripts of various earnings conference calls.

■ Courts can consider securities offerings and corporate disclosure documents that are publicly available. See *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n. 7 (9th Cir.2008) ("Defendants sought judicial notice for Corinthian's reported stock price history and other publicly available finan-

---

**141.** Taking judicial notice of matters of public record does not convert a motion to dismiss into a motion for summary judgment. *MGIC Indemnity Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir.1986).

**142.** Declaration of Ramzi Abadou in Support of Opposition to Defendants' Motions to Dismiss ("Abadou Decl."), Docket No. 87 (June 30, 2011), Exh. 3.

cial documents, including a number of Corinthian's SEC filings. In its dismissal order, the court granted Defendants' unopposed requests for judicial notice. Metzler does not contest the propriety of the noticing of these documents on appeal, which in any event was proper"). In addition, courts may consider documents that are referenced in the complaint under the "incorporation by reference" doctrine. *In re Stac Electronics Securities Litigation,* 89 F.3d at 1405 n. 4 (discussing securities offering documents); *Fecht v. Price Co.,* 70 F.3d 1078, 1080 n. 1 (9th Cir.1995) ("Defendants attached to their motion to dismiss the full text of the Company's corporate disclosure documents and the securities analysts' reports quoted in the Complaint. Plaintiffs argue that because the district court considered the full text of these documents—many portions of which were not pleaded in the Complaint—defendants' motion to dismiss should have been converted into a motion for summary judgment, affording plaintiffs the opportunity to present additional evidentiary materials. This argument is foreclosed by *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994), cert. denied, 512 U.S. 1219, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994), in which we stated: As it makes sense and comports with existing practice, we hold that documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss. Such consideration does 'not convert the motion to dismiss into a motion for summary judgment,'" quoting *Branch,* 14 F.3d at 454 (in turn quoting *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 n. 3 (1st Cir.1991))); see also *In re Silicon Graphics, Inc. Securities Litigation,* 183 F.3d 970, 986 (9th Cir.1999) (holding that the district court properly considered SEC filings under the incorporation by reference doctrine because their contents were alleged in the complaint). Many of the conference call transcripts, in particular, are referenced throughout the complaint, such that the court can consider them under the incorporation by reference doctrine. See *In re Gilead Sciences Securities Litig.,* C 03–4999 MJJ, 2005 WL 181885, *4 (N.D.Cal. Jan. 26, 2005) ("The Court can take judicial notice of Exhibit D because 'the Court may take judicial notice of documents on which allegations in the [complaint] necessarily rely, even if not expressly referenced in the [complaint], provided the authenticity of those documents is not in dispute.' *In re Calpine Corp. Sec. Litig.,* 288 F.Supp.2d 1054, 1076 (N.D.Cal.2003). Plaintiffs necessarily rely upon this conference call because they claim that Defendants perpetuated a fraud on the market with the July 31, 2003 financial announcement and estimated inventory build-up. Therefore, the statements made in the conference call directly relate to the claim of fraud on the market and the transcript reflects information available to the market at the time"); *In re Northpoint Communications Group, Inc. Securities Litigation,* 184 F.Supp.2d 991, 994 n. 1 (N.D.Cal. 2001) ("In a securities-fraud suit, judicial notice can be had of documents directly related to documents referenced in the complaint that bear on the adequacy of the disclosure" (citations omitted)).

Finally, the SEC Investor Bulletin is a proper subject of judicial notice, as it is a government publication and matter of public record. See *Lee,* 250 F.3d at 688; *Branch,* 14 F.3d at 454; see also *In re Seracare Life Sciences, Inc.,* No. 05–CV–2335–H (CAB), 2007 WL 935583, *4 (S.D.Cal.2007) (taking notice of an Accounting Research Bulletin, as it "is not subject to reasonable dispute in that it is capable of accurate and ready determination by reference to sources whose accuracy cannot be reasonably questioned").

Therefore, the court takes judicial notice of the existence and contents of American Apparel's Forms 10–K, 10–Q, and 8–K, Endeavor Acquisition Corp.'s Form 14–A, Charney's Schedule 13D, the transcripts from various earnings conference calls, and the SEC Investor Bulletin.[143]

### 2. News Reports and Press Releases

Plaintiffs and defendants next request that the court take judicial notice of multiple news reports and press releases describing American Apparel's business before and during the class period, as well as purported statements by representatives of the company.[144]

■ Although the parties dispute the purpose for which some of these documents should be considered, the requests for judicial notice of the existence and contents of the reports are largely unopposed. Taking judicial notice of news reports and press releases is appropriate for show "that the market was aware of the information contained in news articles . . . ." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n. 18 (9th Cir.1999); see also *In re White Electronic Designs Corp. Sec. Litig.*, 416 F.Supp.2d 754, 760 (D.Ariz.2006) ("[J]udicial notice is appro-

priate for SEC filings, press releases, and accounting rules as they are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned" (internal quotations and citations omitted)).

Courts in the Ninth Circuit routinely take judicial notice of press releases. See, e.g., *In re Netflix, Inc. Securities Litig.*, Nos. C 04–2978 WHA, C 04–3021, C 04–3204, C04–3233, C 04–3329, C 04–3770, C 04–3801, 2005 WL 3096209, *1 (N.D.Cal. Nov. 18, 2005); *In re Ligand Pharmaceuticals, Inc. Securities Litig.*, CV 04–1620 DMS LSP, 2005 WL 2461151, *2 n. 1 (S.D.Cal. Sept. 27, 2005); *In re Homestore.com. Inc. Sec. Litig.*, 347 F.Supp.2d 814, 816–17 (C.D.Cal.2004) (stating that the court can take judicial notice of press releases).

In addition, some of the documents in question, such as the *Los Angeles Times* article titled "Employer is for Open U.S. Door" and *The New York Times* article titled "Politics Wrapped in a Clothing Ad," are explicitly referenced in the complaint, making consideration of them proper under the incorporation by reference rule.[145] *Branch*, 14 F.3d at 454.

---

**143.** Plaintiffs assert that defendants "repeatedly reference certain filings in their motion to dismiss as support for the truth of certain factual contentions." The court takes judicial notice of only of the existence and contents of the SEC filings, not the truth of information contained in them. See *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir.1996) ("When deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC. Such documents should be considered only for the purpose of determining what statements the documents contain, not to prove the truth of the documents' contents . . ."); *In re Foundry Networks, Inc.*, C 00–4823 MMC, 2003 WL 23211577, *10 n. 11 (N.D.Cal. Feb. 14, 2003) ("Plaintiffs 'object to the request to

the extent defendants seek to establish the truth of the contents in the noticed documents,' but raise no objection to the extent the request asks the Court to take notice of the contents of the documents. Defendants' request is hereby GRANTED to the extent it requests that the Court take judicial notice of the content of such documents"); *Del Puerto Water Dist. v. U.S. Bureau of Reclamation*, 271 F.Supp.2d 1224, 1234 (E.D.Cal.2003) ("Judicial Notice is taken of the existence and authenticity of the public and quasi public documents listed. To the extent their contents are in dispute, such matters of controversy are not appropriate subjects for judicial notice").

**144.** See, e.g., American Apparel PJN, Exhs. 1, 4; Plaintiffs' RJN, Exhs. 1, 2, 10.

**145.** American Apparel RJN, Exhs. 1, 4.

Defendants object to one of plaintiffs' requests for judicial notice of a newspaper article, a news report published in *The New York Times* on June 13, 2011, titled "The Importance of Being Audited." This story concerns "problems with reverse mergers, including murky financial disclosure[s]." [146] The focus of the article appears to be reverse mergers with Chinese companies. Defendants cite *Patel v. Parnes*, 253 F.R.D. 531 (C.D.Cal.2008), a securities fraud action in which the court declined to take judicial notice of news articles that concerned general economic conditions in a defendant's industry rather than the defendant itself. *Id.* at 549–50. The cases that discuss news articles as part of the "total mix" of information available to investors concern articles about the defendant's activities and performance, not articles about an industry as a whole. See, e.g., *In re Yukos Oil Co. Securities Litig.*, Civ 04–5243 WHP, 2006 WL 3026024, *21 (S.D.N.Y. Oct. 25, 2006) (noting in the context of a motion to dismiss that "[t]o the extent Plaintiffs allege that Yukos failed to disclose that Khodorkovsky was politically active, such a non-disclosure, even if true, was immaterial in light of the wealth of publicly available information to that effect. In fact, the newspapers were saturated with references to Khodorkovsky's pro-Yeltsin, anti-Putin proclivity. Thus, even if Yukos failed to make that fact explicit, no reasonable juror could find 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the "total mix" of information made available,'" quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002), and citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir.2000) (holding that a misstatement or omission is not material if the undisclosed fact is already in the public domain); and *White v. H & R Block, Inc.*, Civ. 02–8965 MBM, 2004 WL 1698628, *12 (S.D.N.Y. July 28, 2004) (dismissing claims because the allegedly omitted fact was disclosed in the press)); *Smith v. Circuit City Stores, Inc.*, 286 F.Supp.2d 707, 721 (E.D.Va.2003) (considering news articles directly related to the defendant and observing that "[d]isclosure of information already publicly available does not materially alter the 'total mix' of available information," citing *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262–63 (4th Cir.1993) (disclosure of company's fiscal problems by third parties in newspaper articles and analyst's reports "more than cured any omission by [the company]")).

■ The court, therefore, declines to take judicial notice of Exhibit 2 to the Abadou Declaration, as it does not explicitly reference any of the defendants, is not discussed in the complaint, and does not relate to American Apparel's business or financial condition during the relevant period. Additionally, as defendants note, "[a]lthough a court may take judicial notice of a newspaper article, petitioner must meet the burden of demonstrating that the facts of the article are either '(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned' as required under Rule 201(b) of the Federal Rules of Evidence." See *Hardison v. Newland*, No. C984517CRB(PR), 2003 WL 23025432, *5 (N.D.Cal. Dec. 17, 2003); see also *Castaneda v. Saxon Mortg. Servs. Inc.*, 687 F.Supp.2d 1191, 1196 (E.D.Cal.2009) (denying a request for judicial notice of an unpublished article "which expresse[d] opinions of the author that may reasonably be questioned"); *Ekdahl v. Ayers*, No. C 07–3642 SBA (PR), 2008 WL 4344314, *3

**146.** Abadou Decl., Exh. 2.

(N.D.Cal. Sept. 22, 2008) (denying a request for judicial notice of two articles containing opinions regarding policy).

### 3. Documents Received as a Result of Plaintiffs' FOIA Request

Shortly before the hearing, plaintiffs filed a request for judicial notice of two documents they had obtained by submitting a FOIA request to DHS.[147] One document is an internal "Report of Investigation" concerning ICE's I–9 inspection.[148] The second is an "ICE Memorandum to Case File–Determination of Civil Money Penalty." [149]

■ Plaintiffs assert that the court should judicially notice these documents because they show that ICE made certain "findings" regarding American Apparel's hiring of unauthorized workers. Defendants oppose the request to the extent plaintiffs rely on the documents for the truth of the assertions they contain.[150] Because plaintiffs obtained the documents by making a FOIA request, the court will take judicial notice of them as matters of public record. See *Silverstrand Investments v. AMAG Pharmaceuticals, Inc.,* Civil Action No. 10–10470–NMG, 2011 WL 3566990, *4 (D.Mass. Aug. 11, 2011) (taking judicial notice of "FDA Meeting Minutes and [an] accompanying FOIA Letter"). It notes, however, that the documents are heavily redacted, as is often true of documents received in response to FOIA requests. Although the documents refer to a January 3, 2008, I–9 inspection at the company, as well as various dates on which ICE personnel interacted with American Apparel representatives, the documents themselves are not dated, making it difficult to discern when the agency made its findings. In addition, plaintiffs appear to seek judicial notice of the truth of the documents' contents, suggesting that the court can infer scienter from the number of substantive violations reported in the documents.[151] Doing so would be inappropriate in the context of a motion to dismiss under Rule 12(b)(6). *In re Easysaver Rewards Litig.,* 737 F.Supp.2d 1159, 1171 (S.D.Cal.2010) ("The Court will not, however, consider the findings within the Senate's reports. As the Defendants correctly note, the facts can be disputed, the findings pertained to other companies, and the conclusions involve interpretation, opinion, and judgment"); *Cactus Corner, LLC v. U.S. Dep't of Agric.,* 346 F.Supp.2d 1075, 1100 (E.D.Cal. 2004) (refusing to take notice of data prepared by a government agency to the extent it was offered for the "accuracy and validity of the [report's] contents"); *Silverstrand,* 2011 WL 3566990 at *4 (declining to take notice of documents for "truth of the contents therein").[152]

---

**147.** Request for Judicial Notice–Supplemental ("Supp. RJN"), Docket No. 97 (Sept. 8, 2011).

**148.** *Id.,* Exh. 11.

**149.** *Id.,* Exh. 12. Plaintiffs state that the request was filed late because they did not receive the documents until September 7, 2011, and therefore could not append them to the complaint.

**150.** Defendant American Apparel's Opposition to Plaintiff's Supplemental Request for Judicial Notice, Docket No. 100 (Sept. 14, 2011).

**151.** Supplemental Memorandum of Points and Authorities in Support of Lead Plaintiff's Supplemental Request for Judicial Notice, Docket No. 101 (Sept. 14, 2011) at 5.

**152.** Following the hearing, defendants filed an untimely request for judicial notice, asking that the court consider a January 9, 2012 letter from the SEC, which stated that the agency had completed its investigation and did not intend to file an enforcement action. (Second Supplemental Request for Judicial Notice in Support of Defendant American Apparel, Inc.'s Motion to Dismiss Consolidated Class Action Complaint, Docket No. 102 (Jan. 10, 2012).) Plaintiffs oppose American Apparel's request. The court has not relied on this document in reaching its conclusions,

## C. Legal Standard Governing the Pleading of Securities Fraud Claims

Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances constituting fraud or mistake shall be stated with particularity." FED.R.CIV. PROC. 9(b). A securities fraud claim cannot survive a motion to dismiss under this rule merely by alleging that certain statements were false. *Metzler*, 540 F.3d at 1070 ("A litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet this standard"); see also *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir.2010) ("Plaintiffs must "demonstrate that a particular statement, when read in light of all the information then available to the market, or a failure to disclose particular information, conveyed a false or misleading impression," " quoting *In re Convergent Technologies Sec. Litig.*, 948 F.2d 507, 512 (9th Cir.1991)). Rather, the complaint must allege "why the disputed statement was untrue or misleading *when made.*" *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1549 (9th Cir.1994) (en banc) (emphasis added).

In 1995, Congress passed the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, which amended the Securities Exchange Act of 1934. The PSLRA modified Rule 9(b)'s particularity requirement, "providing that a securities fraud complaint [must] identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1); see *Silicon Graphics*, 183 F.3d at 996. The statute requires, with respect to pleading that each allegedly misleading statement or omission was made with scienter, that plaintiff "state with particularity ... facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). If the complaint does not contain such allegations, it must be dismissed. 15 U.S.C. § 78u–4(b)(3)(A).[153]

In enacting the PSLRA, "Congress 'impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b–5.'" *Tellabs*, 551 U.S. at 320, 127 S.Ct. 2499 (citing *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006)). The PSLRA's heightened particularity requirement "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061 (citing *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1133 (9th Cir.2002)).

## D. Legal Standard Governing Liability Under Section 10(b) and Rule 10b–5

Rule 10b–5, promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the 1934 Act, makes it

and therefore declines to rule on the request for judicial notice.

**153.** The PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without actual knowledge of their falsity. 15 U.S.C. §§ 77z–2(c), 78u–5(c). Such statements include, but are not limited to, statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z–2(i), 78u–5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. See, e.g., *Plevy v. Haggerty*, 38 F.Supp.2d 816, 830 (C.D.Cal. 1998).

unlawful for any person to use "manipulative or deceptive device[s]" in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b). Specifically, one cannot "(a) ... employ any device, scheme, or artifice to defraud; (b) ... make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) ... engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

■ The elements of a section 10(b) or Rule 10b–5 violation are (1) the misrepresentation or omission of a material fact, (2) scienter, (3) reliance (4) in connection with the purchase or sale of a security, (5) economic loss and damages, and (6) loss causation. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 341, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); see also *Paracor Finance, Inc. v. General Electric Capital Corp.,* 96 F.3d 1151, 1157 (9th Cir.1996) (en banc); *McCormick v. Fund American Companies, Inc.,* 26 F.3d 869, 875 (9th Cir.1994). "Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). While recklessness can constitute scienter, see *Nelson v. Serwold,* 576 F.2d 1332, 1337 (9th Cir.1978), the Ninth Circuit in *Silicon Graphics* clarified that recklessness "satisfies scienter under § 10(b)" only to the extent that it "reflects some degree of intentional or conscious misconduct." *Silicon Graphics,* 183 F.3d at 977; see also *Zucco Partners, LLC v. Digimarc Corp.,*

552 F.3d 981, 991 (9th Cir.2009) (reiterating the standard for scienter articulated in *Silicon Graphics* following *Tellabs* ); *Metzler,* 540 F.3d at 1066 (same).

### E. Whether Plaintiffs Have Adequately Pled Defendants' Alleged Material Misrepresentations and/or Omissions

To state a claim for securities fraud, the complaint must specify "each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1).

■ Plaintiffs allege that defendants made three types of false statements. First, they assert defendants falsely claimed that all their employees were authorized to work in the United States, when in fact large numbers of employees had to be terminated after ICE could not verify their eligibility to work in this country. Second, after the results of the ICE investigation were disclosed and the company laid off a significant number of employees at its Los Angeles manufacturing plant, defendants purportedly misrepresented the extent to which those layoffs would affect the company's profitability. Finally, plaintiffs allege that defendants repeatedly assured the public that American Apparel's accounting practices were conservative and careful, when in fact the company's financial statements contained material misrepresentations and omissions, and it failed to disclose material information to its auditors.

Defendants contend that plaintiffs have failed to plead falsity with the requisite particularity. The court addresses defendants' arguments below in the context of the three categories of misstatement identified in the complaint.[154]

---

**154.** The complaint alleges that "[t]he individual Defendants are liable for the false statements pleaded, as those statements were each 'group-published' information, the re-

sult of the collective actions of the Individual Defendants." (*Id.,* ¶ 52.) The individual defendants challenge the viability of "group pleading," which was a permissible means of

### 1. American Apparel's Employment of Unauthorized Workers and Its Compliance with Federal Immigration Laws

Plaintiffs assert that during the class period, American Apparel claimed it was in compliance with the immigration laws when in reality it had employed hundreds of undocumented workers and workers who had not submitted adequate documentation of their eligibility for employment. To support this allegation, plaintiffs focus primarily on three statements made during the class period—American Apparel's November 2007 Proxy Statement, which asserted that its "workers are documented immigrants, authorized to work in the United States";[155] the company's March 17, 2008 Form 10–K, which stated that it "makes diligent efforts to comply with all employment and labor regulations, including immigration laws";[156] and a statement in American Apparel's July 1, 2009, Form 8–K, which asserted that it is "the Company's policy, and has been at all times, to fully comply with its obligations to establish the employment eligibility of prospective employees under immigration laws."[157] To show that these statements were false, plaintiffs cite the fact that the ICE investigation eventually led to the dismissal of approximately 1,500 of employees, who comprised a significant portion of the work force at American Apparel's Los Angeles factory.[158] Plaintiffs also allege that American Apparel's failure to use E–Verify and other government-mandated employment verification best practices is probative of falsity.[159]

Plaintiffs' allegation concerning the November 2007 Proxy Statement quotes the document selectively. The Proxy Statement, which was attached to American Apparel's request for judicial notice, states: "*Many* of American Apparel's workers are

attributing a company's statements to its officer prior to enactment of the PSLRA. (Charney/Kowalewski MTD at 7–8.) This viability of "group pleading" post-PSLRA is in question. See *In re Hansen Natural Corp. Securities Litigation*, 527 F.Supp.2d 1142, 1153–54 (C.D.Cal.2007) ("[T]his Court concludes that the group pleading doctrine can no longer be used in pleading cases under the PSLRA.... The demise of the group pleading doctrine in post-PSLRA cases also was examined in the Fifth Circuit in *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364 (5th Cir.2004). This view is shared by numerous district courts within this circuit. See, e.g., *In re Tibco Software Secs. Litig.*, 2006 WL 1469654, *27 ... (N.D.Cal. May 25, 2006) ('courts in this district are increasingly finding that the group pleading doctrine is contrary to the PSLRA'); *In re Nextcard Sec. Litig.*, 2006 WL 708663, *3 ... (N.D.Cal. Mar. 20, 2006) ('This Court adopts the reasoning of the decisions concluding that the group published pleading doctrine no longer is viable after the PSLRA.')").

The court agrees that the viability of group pleading under the PSLRA is questionable. Here, as in *Nextcard*, however, "[t]he Court's conclusion makes little difference ..., be-

cause Plaintiffs do not rely solely on the group published pleading doctrine, but also allege explicitly that [the individual defendants] participated in the preparation of the company's press releases and SEC filings. Section 10(b) liability extends to those who substantially contribute to the drafting of the allegedly misleading statements.... Thus, the false and misleading statements included in press releases and SEC filings were made by and are attributable to all of the defendants because the press releases and SEC filings were the collective actions of these defendants." (See Complaint, ¶ 50 ("The Individual Defendants substantially participated in the issuance and/or review of the false and/or misleading statements alleged herein, including the false SEC filings and reports issued to American Apparel shareholders").)

**155.** Complaint, ¶ 71.

**156.** *Id.*, ¶ 73.

**157.** *Id.*, ¶ 84.

**158.** *Id.*, ¶ 70.

**159.** *Id.*, ¶ 73.

documented immigrants and authorized to work in the United States; however, changes in immigration and labor laws could affect such labor force."[160] Plaintiffs assert defendants' statement that "many" of the company's workers were documented is not equivalent to disclosing that a substantial portion of the work force was undocumented.[161] A neutral reading of the November 2007 proxy statement indicates otherwise, however. Stating that "many" of a company's workers are documented immigrants does not necessarily constitute an admission that the rest of the workers are undocumented; it could just as easily have been meant to suggest that the remainder of the employees were non-immigrants or U.S. citizens. Thus, the court cannot infer from the face of the 2007 statement alone that American Apparel was implicitly signaling that many of its workers were not authorized to work in the United States.

The other statements plaintiffs plead successfully allege falsity, however. The March 17, 2008 Form 10–K reported that American Apparel *"makes diligent efforts to comply* with all employment and labor regulations, including immigration laws."[162] The July 1, 2009, Form 8–K stated that it was "the Company's policy, *and has been at all times, to fully comply* with its obligations to establish the employment eligibility of prospective employees under immigration laws."[163]

Given the number of employees that had subsequently to be terminated, it is hard to credit defendants' assertion that plaintiffs' allegations concerning these statements merely plead "fraud by hindsight."[164] The court acknowledges that one of the primary goals of the PSLRA was to eradicate this type of pleading. See *In re Vantive Corp. Securities Litigation,* 283 F.3d 1079, 1084–85 (9th Cir.2002) ("The purpose of this heightened pleading requirement was generally to eliminate abusive securities litigation and particularly to put an end to the practice of pleading 'fraud by hindsight,'" quoting *Silicon Graphics,* 183 F.3d at 988). Just as plaintiffs must plead falsity with particularity to satisfy Rule 9(b) and the PSLRA, however, defendants cannot use the mere "incantation of fraud-by-hindsight" to "defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made." *In re Bear Stearns Companies, Inc. Sec., Deriv., and ERISA Litig.,* 763 F.Supp.2d 423, 487 (S.D.N.Y.2011).[165]

160. American Apparel RJN, Exh. 2 at 7 (emphasis added).

161. Plaintiffs' Opp. at 15.

162. Complaint, ¶ 73 (emphasis added).

163. *Id.,* ¶ 84 (emphasis added).

164. American Apparel MTD at 15.

165. Standing alone, defendants' failure to use E–Verify, "among other employment eligibility systems," does not demonstrate falsity. (Complaint, ¶ 73.) Falsity must be pled with particularity, and the mere failure to use certain compliance programs does not show that the company's representation that it act-ed diligently was false. Despite ICE's endorsement of the program, the accuracy and reliability of E–Verify is the subject of some controversy. See generally *Chamber of Commerce of U.S. v. Whiting,* —— U.S. ——, 131 S.Ct. 1968, 1985–97, 179 L.Ed.2d 1031 (2011) (discussing debates surrounding E–Verify's efficacy). While "the Federal Government has consistently expanded and encouraged the use of E–Verify," *id.* at 1986, there may be other ways of ensuring compliance with the immigration laws. It is plaintiffs' burden to plead why defendants' failure to use E–Verify demonstrates that the company was not diligent in its efforts to comply with the immigration laws. Whether that be because American Apparel used no other procedure to monitor its compliance or for some other reason is not pled.

ICE conducted an investigation and audit of American Apparel's Form I–9s and other records, which defendants concede resulted in the termination some 1,500 employees, or more than *one third* of the work force at American Apparel's primary Los Angeles facility. The company admitted that many of the terminated employees had worked at American Apparel for a decade or more.[166] The company's statements concerning diligence and "full" compliance with the immigration laws were made in March 2008 and July 2009, 19 months and three months before it disclosed the terminations, respectively. Given the extent of the company's noncompliance, and the fact that many of those discharged were long-term employees, it is a plausible inference that there were significant compliance problems at the time the statements were made. Although defendants assert that "[a]ll that is left is the suggestion that the Company misstated its compliance efforts because ICE ultimately determined that the Company had employed allegedly undocumented workers."[167] First, the court cannot agree that that is "all that is left." Plaintiffs allege that ICE found significant flaws in American Apparel's employment eligibility recordkeeping. This alone calls into question the company's representation that it made diligent efforts to comply with the immigration laws and that its policy was

fully to comply with those laws. Second, the sheer number of employees who were ultimately terminated calls the veracity of the statements into question as well. "In reviewing a complaint under this standard, 'the court must consider all reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs.'" *Metzler*, 540 F.3d at 1061 (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.2002)). It is unclear what inference defendants would have the court draw from plaintiffs' allegations. Defendants make much of the fact that ICE did not find that American Apparel had "knowingly" violated immigration law.[168] While that fact may be relevant to the adequacy of plaintiffs' pleading of scienter, it does not disprove falsity. The large number of employees terminated following the ICE audit, and the fact that no company would discharge so many employees simultaneously if it felt the results of ICE's audit were wrong cannot be reconciled with statements that the company was making "diligent" efforts to comply with the immigration laws "at all times."

For these reasons, the court concludes that plaintiffs have sufficiently pled the falsity of defendants' representations regarding their diligent efforts to comply with the immigration laws and their policy of full compliance with those laws.[169]

---

166. *Id.,* ¶ 81.

167. American Apparel MTD at 15.

168. American Apparel Reply at 5–6.

169. Plaintiffs also assert that American Apparel delayed too long before disclosing the fact that ICE had commenced an investigation of its facilities. They argue that because the company received notification of the ICE audit in late 2008/early 2009, it should have disclosed the information immediately, rather than waiting until it released its FY 2007

Annual Report. (Plaintiffs' Opp. at 17.) Plaintiffs' allegations regarding the timing of the disclosure are confusing. They assert that ICE notified American Apparel that it was conducting an audit in "January 2008," but the company did not disclose this fact until "four months later." (*Id.,* ¶ 72.) Defendants' Annual Report, moreover, was filed on March 17, 2008, and disclosed the ongoing investigation. (Plaintiffs' Opp. at 17.) Even if American Apparel waited before disclosing the information, however, plaintiffs do not allege *why* the delay violated SEC regulations or was misleading.

### 2. American Apparel's Representations Regarding the Effect of the Work Force Reduction on Its Operations and Profitability

Plaintiffs also allege that defendants misrepresented the effect the termination of the employees would have on its operations and profitability. Beginning with its June 30, 2009 Form 8–K, American Apparel acknowledged that the ICE investigation would likely result in the termination of a substantial number of employees. Initially, company representatives stated that despite the large staffing reduction, "the Company [did] not presently believe that the loss of employees would have a materially adverse impact on its financial results." [170] American Apparel suggested that surplus inventory and a backlog of job applications would alleviate any adverse impact the terminations might otherwise have. [171] The company offered similar assurances for the remainder of 2009 and into early 2010. It was not until American Apparel released its 2009 year-end financial results that the depth of the company's difficulties became known.

As defendants correctly observe, alleging that certain predictions proved incorrect is not the same as "alleg[ing] with particularity facts that show the initial prediction was a falsehood." *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F.Supp.2d 815, 823 (S.D.Cal.2006). The complaint does not allege facts showing that, at the time the statements were made, American Apparel was already experiencing signifi-

cant difficulties producing and shipping product. Compare *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985–87 (9th Cir.2008) ("The passage, moreover, speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition, and that what the company refers to as backlog includes work that is substantially delayed and at serious risk of being cancelled altogether"); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir.2009) ("Similar to *Berson*, the passage in the Form 10–Q speaks about the risks of product liability claims in the abstract, with no indication that the risk 'may already have come to fruition'"), aff'd, *Matrixx Initiatives, Inc. v. Siracusano*, —— U.S. ——, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). [172]

The parties' central dispute concerning falsity appears to concern whether defendants' admittedly optimistic statements about the impact of the work force reduction contained sufficient caveats that they did not constitute misrepresentations. While defendants' statements were certainly optimistic, not enough facts are pled to show that they were also false. For example, the company's June 30, 2009 Form 8–K, filed shortly after the ICE investigation began, stated that unless work authorization issues could be resolved, the "employees [would] not be able to continue their employment at the Company." [173] Although the Form 8–K also stated the company's "present belie[f]" that the loss of employees would not have

---

**170.** Complaint, ¶ 80.

**171.** *Id.*

**172.** Many of the parties' arguments regarding the falsity of these statements concern defendants' knowledge at the time the statements were made; these arguments are best addressed in examining whether plaintiffs have adequately pled scienter. (See Section F.2.b, *infra.*) See *In re New Century*, 588 F.Supp.2d

1206, 1227 (C.D.Cal.2008) (observing that Ninth Circuit often treats falsity and scienter as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts," citing *In re Read–Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir.2003), and *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).

**173.** *Id.*

a "materially adverse impact on its financial results," [174] it cautioned that the company could not "accurately assess ... the resultant impact of the loss of employees," and could offer "no assurances ... as to how, if at all, the loss of a significant number of manufacturing employees [would] affect its business and operations." [175] During the August 10, 2009, earnings conference call, plaintiffs allege that Kowalewski asserted that the ICE investigation would have no material impact on the company, because it could mitigate the impact of a work force reduction by increasing the hours of its existing workers.[176] On the same call, however, Kowalewski acknowledged that "at this point [he didn't] have an update on what the financial impact [would] be," and that it would be "difficult to estimate." [177] Both in the Form 8–K and during the earnings conference call, defendants framed their optimistic statements as predictions about the future, while acknowledging that the ultimate effect of the work force reduction had yet to be felt. Plaintiffs' allegations of falsity are insufficient to the extent they suggest that plaintiffs should have been aware of the ultimate impact of the ICE investigation, since "even reasonable predictions [can] turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was a falsehood." *In re Downey Sec. Litig.*, No. CV 08–3261–JFW (RZx), 2009 WL 2767670, *5 (C.D.Cal. Aug. 21, 2009) (quoting *Alaska Elec. Pension Fund*, 434 F.Supp.2d at 823); *In re PetSmart, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 993 (D.Ariz. 1999) ("[D]efendants' lack of clairvoyance

simply does not constitute securities fraud").

 Plaintiffs observe that as the class period progressed, defendants' characterization of events became markedly less optimistic. They note that on March 25, 2010, the company issued a press release and conducted a conference call acknowledging that the company's "biggest problem ha[d] been employee productivity." [178] Additionally, during the Summer and Fall of 2010, American Apparel admitted that the staffing reduction was having a major impact on its operations. The fact that the company modified its public stance does not necessarily demonstrate that the optimistic statements were false when made. See *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F.Supp.2d 1059, 1072 (N.D.Cal. 2001) ("[T]he complaint must allege that the 'true facts' arose prior to the allegedly misleading statement. This requirement helps guard against pleading fraud by hindsight and helps prevent providing a complaint passageway through the pleading stage merely because it alleges that the allegedly fraudulent statements conflict with the current state of facts" (citations omitted)). Here, the complaint is devoid of facts showing that defendants' comments were false when made. Cf. *In re Read–Rite Corp.*, 335 F.3d 843, 846 (9th Cir.2003) (" 'To meet this pleading requirement, the complaint must contain allegations of specific "contemporaneous statements or conditions" that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made,' " quoting *Ronconi*, 253 F.3d at 432).[179] Consequently, the court

---

**174.** *Id.*

**175.** *Id.*

**176.** *Id.*, ¶ 92.

**177.** *Id.*

**178.** Complaint, ¶ 103.

**179.** Defendants also claim the protection of the PSLRA's safe harbor provision for "forward-looking" statements since their representations included "meaningful cautionary statements" that minimized the risk of deception. 15 U.S.C. § 78u–5(c)(1). Given the court's conclusion that plaintiffs have failed adequately to plead the falsity of defendants'

concludes that plaintiffs have not sufficiently pled the falsity of defendants' representations regarding the impact of the work force reduction on American Apparel's operations and profitability.

### 3. American Apparel's Financial Statements, Accounting Practices and Internal Controls

Plaintiffs allege finally that defendants made numerous false statements regarding their accounting practices and internal controls. They assert that defendants falsely stated that American Apparel was "taking th[e] issue [of financial compliance and internal controls] very seriously";[180] that it was "looking to build a world class financial team" and "wanted to pursue a strict corporate orthodoxy as far as financial accounting issues";[181] that it was "going to be remediating [ ] material weaknesses so that [it could] get into compliance with Sarbanes–Oxley";[182] and that it was "commit[ted] to conservatism

and maintaining best practices."[183] The PSLRA mandates that plaintiffs describe in detail "the reason or reasons [a] the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B). Allegations of falsity must be accompanied by the "who, what, when, where, and how of the misconduct charged." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir.2003). Plaintiffs' allegations lack this level of specificity.

The allegedly false statements are couched in aspirational terms. The repeated use of words like "pursuing," "looking to build," "going to be" and "committed to" indicates that the company was articulating goals it was trying to meet, not making factual statements about the current status of its financial compliance and accounting records.[184] Similarly, it is difficult to find deception in statements that the company was "on track" to "making significant progress in [its] remediation of deficiencies by year-end,"[185] since the

---

statements regarding the effect of the work force reduction on company operations and profitability, it need not address whether defendants' statements are protected by the safe harbor.

To dismiss a statement under these provisions, however, requires "a stringent showing: There must be sufficient 'cautionary language or risk disclosure [such] that reasonable minds could not disagree that the challenged statements were not misleading.' " *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 947 (9th Cir. 2005) (quoting *In re Stac Elecs. Securities Litigation,* 89 F.3d 1399, 1408 (9th Cir. 1996)). The safe harbor provision also requires that the forward-looking statement be identified as such, and be accompanied by statements "identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 77z–2(c)(1)(A)(i); see also *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox, Co.,* 353 F.3d 1125, 1133 (9th Cir.2004) ("The safe harbor requires that the cautionary language mention 'important factors that could

cause actual results to differ materially from those in the forward-looking statement' "). General, nonspecific cautionary statements are insufficient. See *In re Clorox Co. Securities Litigation,* 238 F.Supp.2d 1139, 1142 (N.D.Cal.2002) ("The cautionary statements must, within context, be meaningful; boilerplate, generalized warnings do not suffice to balance specific predictions"); *In re Amylin Pharm., Inc., Securities Litigation,* No. 01CV1455 BTM (NLS), 2003 WL 21500525, *2 (S.D.Cal. May 1, 2003) ("Vague or boilerplate disclaimers are insufficient to invoke safe harbor protection").

180. *Id.,* ¶ 108.

181. *Id.,* ¶¶ 27, 111.

182. *Id.,* ¶ 110.

183. *Id.,* ¶ 120.

184. See, e.g., American Apparel PJN, Exhs. 4 at 20–22; 10 at 39–44; 18 at 93–95; 20 at 108–13; 23 at 132–37.

185. Complaint, ¶¶ 111–13

comment can hardly be construed as a guarantee that the "remediation" would be complete by a date certain, or even that concrete benchmarks would be met by a target date.[186] See *In re Impac Mortg. Holdings*, 554 F.Supp.2d 1083, 1096 (C.D.Cal.2008) ("In stating that he 'continue[d] to expect solid loan acquisitions and originations,' Defendant Tomkinson was making a forward-looking statement of optimism regarding loan production. Because such a statement is not capable of objective verification, it is properly characterized as a statement of 'mere puffing' "); *In re Wet Seal, Inc. Securities Litigation*, 518 F.Supp.2d 1148, 1168 (C.D.Cal.2007) ("Other statements that have been rejected by previous courts [as corporate puffery or predictions and forecasts that could not be objectively verified] include: (1) "[w]e're the leader in a rapidly growing market," "[w]e have the convergence of the health care trends," and "[w]e have an extremely broad product line," (2) "business couldn't be better," "it's a great time for a company like ours," and "we already have a sizable lead over our competition," (3) claims of "industry leading" growth, growth that "positions us beautifully," "measurable progress," "continuing improvements," "accomplishments we have achieved," expressions of pride in staff, and "outstanding retail results," and (4) "strong," "robust" "well positioned," "solid" and "improved" (internal citations omitted")): see also *In re Cutera Securities Litigation*, 610 F.3d 1103, 1111 (9th Cir.2010) ("When valuing corporations, however, investors do not rely on vague statements of optimism like "good," "well-regarded," or other feel good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation"); *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 379 (9th Cir.2003) ("We agree with the district court that these statements-generally describing the "high priority" Tektronix placed on product development and alluding to marketing efforts-do not state an actionable fraud or negligent misrepresentation claim. The statements were generalized, vague and unspecific assertions, constituting mere 'puffery' upon which a reasonable consumer could not rely"); *In re VeriFone Securities Litigation*, 784 F.Supp. 1471, 1481 (N.D.Cal.1992) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company").

The one allegation that suggests some of these statements may have been false when made concerns the company's relationship with Deloitte. The complaint alleges that American Apparel announced the fact that it had hired Deloitte as part of its ongoing effort to institute stronger financial controls during a May 18, 2009 analyst call.[187] On March 31, 2010, Deloitte signed an audit opinion that failed to include "going concern" language, required if the auditor "reasonably believes" that a company could go bankrupt within 12 months of the date of the audited financial statement.[188] On May 19, 2010, American Apparel announced via an earnings press release that it was likely to go into default

---

**186.** The individual defendants note that plaintiffs once again quote their comments selectively. The transcript of the May 13, 2008 earnings call, during which Charney discussed American Apparel's "strict corporate orthodoxy" reflects that he said: "[W]e have a very creative company and a creative brand but *we want to pursue a strict corporate orthodoxy as far as the financial accounting issues and putting together the team, and we're studying that and working on that very closely.*" (Charney/Kowalewski MTD at 12 (emphasis added).)

**187.** Complaint, ¶ 121.

**188.** *Id.*, ¶ 123.

the following month.[189] Following that announcement, on July 22, 2010, Deloitte resigned as the company's independent auditor because it was "no longer willing to rely on management's representations due to Deloitte's belief that management [had] withheld from Deloitte the February 2010 monthly financial statements until after the 2009 Annual Report [was filed]." [190]

While an analyst report acknowledged that the resignation "did not necessarily imply any degree of misstatement," [191] Deloitte's statements regarding American Apparel's disclosures to its auditor cast serious doubt on the company's earlier representations that it was pursuing a "strict corporate orthodoxy as far as financial accounting issues" and "remediating material weaknesses." The problem plaintiffs face here, however, is a lack of particularity. *In re Nvidia Corp. Sec. Litig.*, No. 08–CV–04260–RS, 2010 WL 4117561, *5 (N.D.Cal. Oct. 19, 2010) ("None of these alleged facts, however, establish the 'who, what, where, when, and how' required by Rule 9(b) or the specificity or particularity required by the PSLRA to survive a motion to dismiss"). While Deloitte's abrupt resignation, and the stated reason therefor, indicate that *something* may well have been wrong with American Apparel's financial reporting and internal controls, the complaint fails to describe the problems or state how they prove that the aspirational statements defendants made were false.

Plaintiff's citation of such cases as *In re New Century*, 588 F.Supp.2d 1206 (C.D.Cal.2008), and *Atlas v. Accredited Home Lenders Holding Co.*, 556 F.Supp.2d 1142 (S.D.Cal.2008) actually undercuts their argument by demonstrating the type of facts regarding internal controls and financial conservatism that should be alleged to survive a motion dismiss. In *New*

*Century*, the court stated that plaintiffs' pleading "adequately support[ed]" a finding that statements regarding the defendant's loan quality and underwriting "were false and misleading when made" because it cited "an array of confidential witness statements that attest[ed] to [defendant's] progressively riskier loan origination practices leading up to and throughout the Class Period; analyze[d] data indicating rising defaults and delinquent loans; and set[ ] forth data, that corroborate[d] the witnesses, showing a proliferation of high-risk loans such as adjustable-rate mortgages provided to less-qualified borrowers." 588 F.Supp.2d at 1225 (internal citations omitted); see also *id.* at 1226 ("The Complaint details declining loan performance, an increase in defaults, and a concomitant rise in repurchase claims, that were baldly disregarded in setting the reserve and valuing residual interests"). In *Atlas*, the court addressed allegations that the defendant had actually loosened *its own* underwriting standards in order to increase dramatically the volume of loans it could make. 556 F.Supp.2d at 1149, 1152 ("The Complaint alleges that Defendants caused Accredited to maintain an inadequate reserve for repurchase losses. Because Accredited *allegedly deviated from its own underwriting guidelines*, during the class period the company allegedly originated loans to an increasing number of borrowers that could be expected to default and by 2006 the company in fact was beginning to be forced to repurchase a growing number of loans"). Here, the complaint is lacking such detail.

### 4. Conclusion Regarding Allegations of Falsity

For the reasons stated, the court concludes that plaintiffs have successfully al-

**189.** *Id.*

**190.** *Id.,* ¶¶ 126–127.

**191.** *Id.*

leged that defendants made false statements regarding American Apparel's compliance with the immigration laws. They have not adequately alleged that statements concerning the impact of the work force reduction that followed ICE's investigation and American Apparel's accounting practices and internal controls were false when made.

### F. Whether Plaintiffs Have Adequately Pled Scienter

#### 1. Legal Standard Governing Pleading of Scienter

As noted, " '[t]he PSLRA significantly altered pleading requirements in private securities fraud litigation by requiring that a complaint plead with particularity both falsity and scienter.' " *Middlesex Retirement System v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1178–79 (C.D.Cal.2007) (quoting *Vantive*, 283 F.3d at 1084). In addition to pleading falsity adequately, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §§ 78u–4(b)(2). "To qualify as 'strong' within the intendment of § 21D(b)(2) ... an inference of scienter must be more than merely plausible or reasonable-it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent.*" *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499 (2007) (emphasis added). "[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss.... The inquiry ... is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23, 127 S.Ct. 2499 (emphasis original).

The Ninth Circuit has articulated a "two-part inquiry for scienter: first, [the court must] determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, ... the court [must] conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council v. Ernst & Young*, 641 F.3d 1089, 1095 (9th Cir.2011) (citing *Zucco*, 552 F.3d at 991–92).[192] The Ninth Circuit has also clarified that "plaintiffs 'must plead, in great detail, facts that constitute strong

---

192. Plaintiffs urge the court to examine their scienter allegations only as a whole, rather than first examining individual allegations separately. They base this argument on the Supreme Court's recent ruling in *Matrixx Initiatives, Inc. v. Siracusano*, —— U.S. ——, 131 S.Ct. 1309, 179 L.Ed.2d 398 (2011). There, relying on its earlier decision in *Tellabs*, the Court reviewed the facts collectively, rather than parsing individual allegations. See *id.* at ("In making this determination, the court must review 'all the allegations holistically,' " citing *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499); see also *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499 ("We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). Plaintiffs also cite the Sixth Circuit's decision in *Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir.2011). That circuit interpreted *Matrixx* as holding that collective con-

sideration of scienter allegations was the "only appropriate approach." See *id.* at 961 ("Our former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency").

The Ninth Circuit's directives in *Zucco* and *New Mexico State Investment Council* bind the court. Given that the two step analysis dictated by the Ninth Circuit explicitly incorporates a holistic review of the facts, plaintiffs will not be prejudiced by the court's examination of individual allegations. In fact, the two-step analysis is designed to guard against the very thing plaintiffs fear, which is that a court will examine each allegation in isolation without considering them in totality. *Zucco*, a post-*Tellabs*, case specifically noted the Supreme Court's instruction that courts view

circumstantial evidence of deliberately reckless or conscious misconduct.'" *Middlesex Retirement System,* 527 F.Supp.2d at 1179 (quoting *Silicon Graphics,* 183 F.3d at 974); see also *Silicon Graphics,* 183 F.3d at 977 ("recklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct"). The requisite state of mind must be an " 'departure from the standards of ordinary care [that] presents a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Zucco,* 552 F.3d 981, 991 (quoting *Silicon Graphics,* 183 F.3d at 984). If plaintiffs rely on allegations of recklessness, the pleading standard requires that they "state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *Silicon Graphics,* 183 F.3d at 979. Allegations of mere negligence are insufficient. *Glazer Capital Management, LP v. Magistri,* 549 F.3d 736, 748 (9th Cir.2008) ("At most, it creates the inference that he *should have known* of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA"); *Police Retirement Systems of St. Louis v. Intuitive Surgical, Inc.,* No. 10–CV–03451–LHK, 2011 WL 3501733, *7 (N.D.Cal. Aug. 10, 2011) ("[T]he Ninth Circuit defines 'recklessness' as a highly unreasonable omission [or misrepresentation], involving not merely simple, or even inexcusable

plaintiffs' allegations of scienter holistically, but stated that consideration of individual allegations of scienter was still pertinent when comparing whether the inference of knowledge or recklessness plaintiffs seek to draw is at least as compelling as the competing inference. See *Zucco,* 552 F.3d at 991–92 (9th Cir.2009) ("[W]e recognize that *Tellabs* calls into question a methodology that relies exclusively on a segmented analysis of scienter. We read *Tellabs* to mean that our prior, segmented approach is not sufficient to dismiss an allegation of scienter. Although we have continued to employ the old standards in determining whether a plaintiff's allegations of scienter are as cogent or as compelling as an opposing innocent inference, we must also view the allegations as a whole").

Plaintiffs suggest that the Ninth Circuit's decision in *South Ferry LP No. 2 v. Killinger,* 542 F.3d 776 (9th Cir.2008), also casts doubt on the two step analysis used in *Silicon Graphics, Vantive,* and *Read–Rite. South Ferry's* discussion of pleading scienter focused on the inference to be drawn from the fact that allegedly false statements concern a company's "core operations." In holding that such an allegation should be evaluated in conjunction with other allegations of scienter, even if vague or ambiguous, to discern whether the whole of the allegations is greater than its parts, the *South Ferry* court acknowledged that *"Tellabs* suggests that ... a court should look to the complaint as a whole, not to each individual scienter allegation as *Silicon Graphics* suggests." *Id.* at 784. *Id.* at 784 (*"Tellabs* suggests that while a high level of detail is required under the PSLRA, a court should look to the complaint as a whole, not to each individual scienter allegation as *Silicon Graphics* suggests"). It concluded that in the case before it-which concerned how much reliance plaintiffs could place on the "core operations" inference that following *Tellabs,* the court should "consider the totality of circumstances, rather than ... develop separately rules of thumb for each type of scienter allegation." *Id.* It did not comment specifically on the two-step analysis used in earlier cases. Moreover, both *Zucco* and *New Mexico State Investment Council* were decided *after South Ferry.* Each employed the two-step analysis and *Zucco,* as noted, continued to endorse as a means of comparing the competing inferences that can generally be drawn from plaintiffs' allegations in a securities fraud case. See *New Mexico State Investment Council,* 641 F.3d at 1095 ("Under *Tellabs* and Ninth Circuit law, we conduct a two-part inquiry for scienter: first, we determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness"); *Zucco,* 552 F.3d at 991–92.

negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.").

When determining whether plaintiffs have alleged facts showing a strong inference of scienter, the court must draw all reasonable inferences from the allegations presented, including inferences unfavorable to plaintiffs. *Gompper*, 298 F.3d at 897. "However, the 'inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible[,]" [however]—it must be cogent and compelling . . . in light of other explanations.' " *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499).

### 2. Plaintiffs' Allegations of Scienter

▮ Defendants contend that plaintiffs have not pled scienter with the degree of particularity required by the PSLRA.[193] Although the court has determined that two of the three varieties of false statements plaintiffs allege are not adequately pled, it must review the allegations to determine whether plaintiffs have adequately pled scienter. See, e.g., *In re Autodesk, Inc. Sec. Litig.*, 132 F.Supp.2d 833, 842–43 (N.D.Cal.2000) (analyzing scienter after determining that the complaint failed to plead falsity with particularity). Moreover, the Ninth Circuit often treats the falsity and scienter analyses as "a single inquiry, because falsity and scienter are generally inferred from the same set of facts." *New Century*, 588 F.Supp.2d at 1227 (citing *Read–Rite*, 335 F.3d at 846 and *Ronconi*, 253 F.3d at 429). Plaintiffs' allegations of scienter correspond to their allegations of falsity and arise from largely the same facts. The court addresses each allegation in turn, before reading the whole of the complaint to determine whether it supports the required "strong inference" of scienter.

### a. Defendants' Misrepresentations Regarding Its Employees' Work Authorization

As noted, plaintiffs have successfully alleged that American Apparel and the individual defendants made false and misleading statements regarding the company's efforts to comply with immigration laws. Those statements proved to be dramatically incorrect once the ICE investigation concluded, and the company discharged approximately 1,500 workers. Demonstrating that defendants made the statements intentionally or were deliberately reckless in making them is another. The key to pleading intentional or reckless conduct is pleading facts that show that when defendants made the allegedly false statements, they knew they were false, or knew facts "so obvious that they must have been aware" that they were misleading the public. *Zucco*, 552 F.3d at 991.

Plaintiffs attempt to satisfy this standard in various ways. They cite Charney's general statements regarding the need for immigration reform and amnesty for undocumented immigrants before and during the class period.[194] They note Charney's speculation that "over 50% of the workers in [the garment] industry are falsely documented"[195] and that apparel

---

**193.** American Apparel MTD at *21;* Charney/Kowalewski MTD at *13.*

**194.** See, e.g., Complaint, ¶¶ 8–10.

**195.** *Id.,* ¶¶ 8, 78. The full article in which this quote appears is appended to American Apparel's request for judicial notice. (American Apparel RJN, Exh. 2.) The relevant passage states:

manufacturers who did not support amnesty were "cutting off their noses" to spite their faces.[196] These allegations regarding Charney's political views and the garment industry in Los Angeles, however, do not necessarily support an inference that defendants knew or deliberately and recklessly disregarded the fact that their procedures respecting immigration compliance were deeply deficient. Plaintiffs do not allege facts that demonstrate defendants had actual, contemporaneous knowledge that *American Apparel itself*—not the garment industry in general, or other companies in the industry-had employed undocumented or illegal workers.[197] *Read–Rite*, 335 F.3d at 847 (holding that post-class period statements were insufficient to raise a strong inference of scienter during class period); *Vantive*, 283 F.3d at 1090–91 (the complaint must contain allegations of "specific contemporaneous conditions known to the defendants that would strongly suggest that the defendants understood" what the impact of their actions would be).[198] Moreover, as the individual defendants note, Charney's comments regarding immigration reform and the garment industry, as well as his alleged commitment to good working conditions for his employees, could be interpreted as underscoring his commitment to "employ[ ] ... legal immigrant workers and increas[e] the number of documented immigrants in the United States." [199]

Plaintiffs also assert that Charney's repeated statements regarding the level of his involvement in the company and its manufacturing operations gives rise to an inference that he possessed actual knowl-

---

"Charney won't say (if he knows) how many of his employees are illegal immigrants."

" 'Our rule is that if you present the proper ID and it appears to be proper, we hire the worker,' he says. 'Everybody's documented here. If you ask me to speculate, I think over 50% of the workers in my industry are falsely documented.' " (*Id.*)

**196.** *Id.*, ¶ 77.

**197.** Plaintiff's supplemental request for judicial notice does not alter the court's view. The court cannot take notice of the contents of the ICE documents for their truth. One of the exhibits indicates that American Apparel's facilities were inspected on January 3, 2008, and that numerous discrepancies in employees' 1–9 forms were found. (Supp. RJN, Exh. 11.) The report does not indicate whether this finding was made on January 3, 2008 or at some later time. Nor does it state if or when the finding was disclosed to the company. These facts are crucial to any conclusion that the document gives rise to an inference of scienter. The internal ICE memorandum, which sets forth the results of the agency's investigation likewise does not state when ICE made its findings, or whether and when those findings were disclosed to the company. (*Id.*, Exh. 12.) Given the limitations on what the court may consider in deciding a Rule 12(b)(6) motion to dismiss, the documents add little to the scienter analysis.

**198.** Plaintiff's anecdote concerning the fact that Charney hired a "scantily clothed," non-English speaking person off the street adds nothing. (Complaint, ¶¶ 8–9.) While the allegation is presumably included to demonstrate defendants' lax hiring practices, the complaint does not allege that the woman lacked proper authorization to work, or that the company did not properly check employment eligibility. Plaintiffs also fail to connect the incident to a broader pattern of conduct at the company, suggesting that if the woman were undocumented, the incident would not be material. Finally, the anecdote comes from an unnamed person who formerly worked at the company as a customer service representative; plaintiffs plead no facts demonstrating the reporter's reliability. See *Zucco*, 552 F.3d at 995 (holding that confidential witnesses must be "described with sufficient particularity to establish their reliability and personal knowledge," and that "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter").

**199.** Charney/Kowalewski MTD at 11.

edge about the work authorization of the Los Angeles employees. The complaint alleges that Charney spent "50 hours a week" at the factory, and that defendants' offices were located in the same building as the manufacturing plant.[200] Charney described the 1,500 terminated employees as "part of our family for nearly 10 years."[201] These allegations are thin reeds upon which to construct an inference of scienter. Missing from the complaint are facts indicating that Charney was in possession of concrete knowledge that would have led him to conclude that a substantial portion of American Apparel's workers were undocumented. *Zucco,* 552 F.3d at 1000–01 ("Allegations that Digimarc's management had access to the purportedly manipulated quarterly accounting numbers, or that the management analyzed the inventory numbers closely, do not support the inference that management was in a position to know that such data was being manipulated"); *Glazer Capital,* 549 F.3d at 748 ("The mere fact that GE was able to discover the FCPA violations does not create a direct inference that Magistri personally knew about the violations. At most, it creates the inference that he *should* have known of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA"); *Metzler,* 540 F.3d at 1068 ("As this court has noted on more than one occasion, corporate management's general awareness of the day-to-day workings of the company's business

does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud," citing *Vantive,* 283 F.3d at 1087–88 ("[P]laintiffs have failed to cite to any specific report, to mention any dates or contents of reports, or to allege their sources of information about any reports")); *Silicon Graphics,* 183 F.3d at 988 (allowing a plaintiff "to go forward with a case based on general allegations of 'negative internal reports' would expose all those companies to securities litigation whenever their stock prices dropped"). Compare *In re Daou Systems, Inc.,* 411 F.3d 1006, 1021 (9th Cir.2005) (noting that "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports").[202]

The facts pled do give rise to an inference that American Apparel was lax and deficient in its immigration compliance, and perhaps even negligent in making statements about its diligent compliance with immigration regulations that later proved to be demonstrably and substantially false. Even assuming its conduct was negligent, however, a higher level of intent is necessary to plead scienter under the PSLRA. Therefore, plaintiffs' scienter allegations regarding American Apparel's hiring of undocumented workers are inadequate.

200. Complaint, ¶¶ 5, 19.

201. *Id.,* ¶ 17.

202. Plaintiffs cite ICE's post-inspection comments expressing concern that American Apparel may have been engaged in a "scheme" to violate immigration laws. They note ICE's commitment to targeting employers who "knowingly hir[e] and exploit[ ] illegal workers." These allegations are based on comments that a DHS spokesman, Matt Chandler,

made to *The New York Times* on July 3, 2009, and on a *Los Angeles Times* article reporting that an ICE spokeswoman had "concerns about possibly a scheme to avoid immigration law." (*Id.,* ¶ 88.) ICE's concern that there was a "possibility" of a scheme does not prove—or even allege—that there was one. Chandler's comment regarding employers who "knowingly" hire illegal workers and exploit is likewise not an ICE finding that American Apparel knowingly violated the immigration laws.

**1080**

### b. Statements Regarding the Effect of the Work Force Reduction on the Company's Bottom Line

The court next examines plaintiffs' scienter allegations as they concern defendants' statements regarding the effect of the terminates on its operations and profitability. As noted, plaintiffs have failed to allege sufficient facts to show that the statements are actionable or that they were false. Their allegations of scienter fail for similar reasons. To show that forward-looking statements were false, "plaintiffs must prove that [they] were made with 'actual knowledge' that they were false or misleading." *Silicon Graphics*, 183 F.3d at 993 (Browning, J., concurring in part and dissenting in part) (quoting 15 U.S.C. §§ 78u–5(c)(1)(B), 77z–2(c)(1)(B)); *Alaska Elec. Pension Fund v. Adecco S.A.*, 434 F.Supp.2d 815, 823 (S.D.Cal.2006) ("[A] bare allegation that

bad debt reserves were inadequate is insufficient 'because even reasonable predictions turn out to be wrong. Instead, plaintiffs must allege with particularity facts that show the initial prediction was 'a falsehood.'" *Kane v. Madge Networks N.V.*, CV No. 96–20652(RMW), 2000 WL 33208116, *6 (N.D.Cal. May 26, 2000) (in turn quoting *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1549)). Plaintiff's allegations that defendants knew the statements were false rely on (1) statements before and during the early part of the class period indicating that Charney knew the importance of the work force to the company's operations; and (2) statements near the end of and after the class period acknowledging that the company was in dire straits because of its significantly reduced staff and inventory.

Plaintiffs' allegations regarding the first group of statements appear to be based on a "core operations" argument.[203] They

---

**203.** In *South Ferry*, 542 F.3d 776, the Ninth Circuit noted its previous rejection of the argument that "'facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers' under the PSLRA." *Id.* at 783 (citing *Read–Rite*, 335 F.3d at 848–49). It observed, however, that following *Tellabs*, "the core-operations inference can be one relevant part of a complaint that raises a strong inference of scienter." *Id.* at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement, the prior holdings of *Silicon Graphics*, *Vantive*, and *Read–Rite* notwithstanding. Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter.... Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis. The allegations, read as a whole, must raise an inference of scienter that is 'cogent and compelling, thus strong in light of other explanations.' ..."). The court further commented that a pleading that relies "exclusively" on a core operations argument

to show scienter will ordinarily fail, *South Ferry*, 542 F.3d at 783. It noted, however, are two exceptions to this rule. The first is generally outlined in *Berson*, 527 F.3d 982, which involved the "unusual circumstance" of managers who allegedly failed to disclose stop-work orders received from a company's largest customers even though the orders had a devastating effect on revenues. *South Ferry*, 542 F.3d at 785 n. 3 (describing the facts of *Berson* ). Because together, the customers represented more than 80% of the defendant company's revenue, the court concluded that the relationships were "prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Berson*, 527 F.3d at 989 (quoting *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 941 n. 21 (9th Cir.2003)); see also *Zucco*, 552 F.3d at 1001 ("reporting false information will only be indicative of scienter where the falsity is patently obvious").

The second is where allegations concerning core operations are accompanied by "detailed and specific allegations about management's exposure to factual information within the company." *South Ferry*, 542 F.3d at 785; see also *Zucco*, 552 F.3d at 1000 ("To satisfy this standard, plaintiffs might include in their

characterize American Apparel's manufacturing operation as so central to the company's success that defendants must have known that a work force reduction would cripple the company's productivity, and render deceptive their initial optimistic statements. Plaintiffs' cite the November 2007 Proxy Statement, in which the company stated that losing employees who were not eligible to work in the United States would "be adverse to American Apparel's manufacturing capabilities and harm American Apparel's operations and financial results." [204] They also cite Charney's statements in May and November 2008, during analyst and earnings calls, that "swallowing in new workers ... does take a bit of a toll on the business," and that "[a]bsorbing new workers is an issue." [205] Plaintiffs argue that the company repeatedly touted the fact that its employees were a component of its "core business strengths," and that defendants must have known that any impact on the work force would have major ripple effects throughout the company. [206] They contend that these facts, coupled with the vertical integration of American Apparel's business operations and the close relationship between its manufacturing operation and the bottom line, make clear that defendants knew or recklessly and deliberately disregarded the fact that a significant staffing reduction would have a massive and immediate effect on the company's overall profitability.

While these arguments have some persuasive force, defendants' statements are either too vague to be actionable or too attenuated in a temporal sense to support the inference plaintiffs seek to have drawn. As defendants note, the earlier 2008 statements regarding the challenges inherent in training new employees do not necessarily contradict the post-ICE investigation statements about the ability to compensate for staffing reductions with surplus inventory. [207] Charney made the statements eight months to a year before he was faced with having to replace 1,500 workers. The statements do not speak to the strategies defendants developed to deal with that circumstance, nor to whether they believed those strategies would avoid a downturn in company profitability. Moreover, the company properly stated in SEC filings that the ultimate effect of the staffing reduction was uncertain, and that the situation was still developing. The complaint does not allege facts, such as defendants' "contemporaneous receipt of a report with information directly at odds with [the] alleged misrepresentation," or "statements by witnesses that they told the actor the true facts before the false statement was made." *In re Northpoint Communications*, 184 F.Supp.2d at 997; see also *Ronconi*, 253 F.3d at 433 (affirming dismissal because "alleging in substance that [defendant] underestimated the difficulties it would face if it fired 300 salespeople does not make out a fraud case").

Plaintiffs do not rely solely on past statements to show that statements regarding the impact of the work force reduction were made with scienter, however; they also cite statements made near the

complaint " 'specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database,' " a specific admission by a top executive that " '[w]e know exactly how much we have sold in the last hour around the world,' " or other particular "details about the defendants' access to information within the company" " (internal citations omitted)).

**204.** Complaint, ¶ 85.

**205.** *Id.,* ¶ 91.

**206.** *Id.,* ¶ 6.

**207.** American Apparel MTD at 22.

end of and after the class period. These include the March 25, 2010, press release, which disclosed that "[t]he reduction in manufacturing efficiency was principally a result of the forced termination of over 1,500 experienced manufacturing employees";[208] Charney's admission during a May 19, 2010, earnings call that the company did not "have enough people" and that " '[t]here is a hole, in [his] opinion, of a few hundred thousand pieces not being produced every week.... At the store level people come into the store, if you don't have it in stock, if it's not [on] a store floor, they walk away and they may end up buying somewhere else."[209] Additionally, in August and October 2010, Charney admitted that American Apparel "could not respond quickly enough because of ... issues with the factory,"[210] and conceded that the immigration violations "broke our efficiencies and generated a situation where we were late delivering garments. It lost us an enormous amount of money."[211]

■ A later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement. *Yourish v. Cal. Amplifier*, 191 F.3d 983, 996–97 (9th Cir.1999). However, " '[i]t is clearly insufficient for plaintiffs to say that a later, sobering revelation makes an earlier, cheerier statement a falsehood.' " *Id.* at 997 (alterations omitted). Here, the complaint is devoid of any factual allegations suggesting that when Charney, Kowalewski, and American Apparel predicted that the work force reduction would not impact the business, they knew or deliberately and recklessly disregarded the fact that the statements were false. See *Metzler*, 540 F.3d at 1066 ("To meet [the scienter] pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made").[212]

**208.** Complaint, ¶ 102.

**209.** *Id.*, ¶¶ 97, 106.

**210.** *Id.*, ¶ 132.

**211.** *Id.*, ¶ 133.

**212.** Plaintiffs appear to argue that a "core operations" inference may be drawn from the fact that Charney repeatedly stated he was deeply involved in the company's day-to-day operations and management, such that he should have had concrete knowledge of the effects of the workforce reduction on the company. (See Opp. at 33–34.) While admissions by an executive can support an inference of scienter, they must be more concrete than those plaintiffs cite. Charney's statements about "visuality as to what's going on in [his] stores ... [r]ight here and now" are not sufficiently specific. (See Complaint, ¶ 98). See also *Zucco*, 552 F.3d at 1000 (noting that there can be a "strong inference of scienter when [core operations] allegations are buttressed with "detailed and specific allegations about management's exposure to factual information within the company," "

citing *South Ferry*, 542 F.3d at 785). Plaintiffs' allegation that the individual defendants reviewed daily information concerning inventory levels are similarly deficient. (*Id.*) Compare *Silicon Graphics*, 183 F.3d at 985 ("[A] proper complaint which purports to rely on the existence of internal reports would contain at least some specifics from those reports as well as such facts as may indicate their reliability"); see also *Kuehbeck v. Genesis Microchip Inc.*, C 02–5344 JSW, 2005 WL 1787426, *10 (N.D.Cal. July 27, 2005) ("[U]nlike in *Oracle*, Ms. Kuehbeck has not identified specific internal reports that would have provided Defendants with particularized and detailed information about Genesis' sales and whether they were declining, as a result of the alleged problems"); *In re Autodesk*, 132 F.Supp.2d at 844 ("Plaintiffs assert that defendants knew that sales of the R14 were declining because of the internal reports they reviewed. Plaintiffs refer generally to reports generated on a weekly basis by Autodesk's finance department.... Plaintiffs make no specific allegations, however, about the contents of the reports or about how the contents contradicted defendants' public statements.

### c. American Apparel's Accounting Practices and Internal Controls

The third group of purported misrepresentations concern the fact that American Apparel took seriously the matter of financial compliance and internal controls, that it was pursuing "a strict corporate orthodoxy as far as financial accounting issues," and that it was "commit[ted] to conservatism and maintaining best [financial] practices." As noted, plaintiffs have failed adequately to plead the falsity of these statements. The court similarly concludes they have failed to adequately to plead scienter.

The complaint alleges that American Apparel's "material weaknesses in internal controls" caused it to violate various provisions of the 1934 Act, as well as generally accepted accounting principles ("GAAP").[213] The Ninth Circuit has clearly held, however, that "[a] litany of alleged false statements, unaccompanied by the pleading of specific facts indicating why those statements were false, does not meet th[e] standard [set forth in 15 U.S.C. § 78u–4]." *Metzler*, 540 F.3d at 1070; see also *Zucco*, 552 F.3d at 991. Here, the complaint fails to allege what statements

violated GAAP, "why the statements were false, the amount by which they were misstated, what provisions of GAAP were violated, how those provisions were violated, and who was involved in the alleged GAAP violations." *Hansen Natural Corp.*, 527 F.Supp.2d at 1153. Plaintiffs' allegations concerning Deloitte's resignation and the adverse opinion in the 2010 Annual Report regarding the company's internal controls insufficiently plead violations of either the 1934 Act or GAAP.[214]

The most damning allegations, of course, are those regarding Deloitte's resignation as the company's independent auditor, and the company's admission that information had surfaced that might "materially impact the reliability of either its previously issued audit report or the underlying consolidated financial statements" for fiscal year 2009.[215] The company also reported that Deloitte was "no longer willing to rely on management's representations" because it believed that management had withheld crucial financial information and made misrepresentations.[216] The fact that an independent auditor resigns because it feels it cannot rely on management's representations may, under certain circumstances, support an inference that the company was misrepresenting or concealing its financial health.[217]

Moreover, plaintiffs do not explain how they know what was in the reports. Nor do they quote from the reports or provide any factual basis for their claim that such reports were issued. They merely allege that sales were declining, and that there were reports—implying that information regarding declining sales must have been contained in those reports. The allegations in the CAC are insufficient in this regard because Rule 9 and the PSLRA require that plaintiffs provide details regarding how they obtained the reports, who produced the reports, and specifically what information the reports contained").

**213.** *Id.,* ¶¶ 136–40.

**214.** The allegation that Kowalewski said in a December 24, 2008, email that the company "almost went bankrupt last Friday" (*id.,* ¶ 29)

does not show scienter, as the complaint pleads no facts suggesting Kowalewski's statement was true when made, or alleges sufficient detail regarding the nature of Kowalewski's concerns about the company's financial viability. (See Charney/Kowalewski MTD at 15.)

**215.** *Id.,* ¶ 126.

**216.** *Id.*

**217.** That Deloitte's resignation may raise an inference of scienter is not at odds with the court's earlier finding that the resignation alone does not adequately allege the falsity of defendants' statements. The pleading standard for falsity is rigorous, requiring that plaintiffs plead "each statement alleged to

Plaintiffs, however, have failed to allege sufficient additional facts to make that inference more compelling than the competing innocent explanation. As defendants note, the complaint fails to allege with sufficient particularity what aspects of American Apparel's financial statements were false, and how those misstatements were linked to management's alleged misrepresentation or concealment of information from Deloitte. Similarly, the fact that an auditor resigns because it feels it cannot rely on management's representations, by itself, does not demonstrate that management was intentionally, recklessly, or deliberately withholding information as opposed to acting incompetently, in ignorance of applicable financial standards, or in the mistaken belief that the auditor had not asked for specific pieces of information. Without allegations detailing the in-

accuracies in the financial statements, the types of information that defendants purportedly withheld, and the knowledge or participation of the individual defendants in the withholding, plaintiffs fail to plead scienter.[218] While the company ultimately restated its financials, plaintiffs do not allege the effect of the restatement on the company's financial health or profitability. The company asserted, in fact, that the restatement "did not have any impact on [its] previously reported net cash flows, cash position, revenues, net income or comparable store sales."[219] See *Zucco*, 552 F.3d at 1000 ("In general, the mere publication of a restatement is not enough to create a strong inference of scienter").

For all of these reasons, the court finds plaintiffs' allegations of scienter regarding statements concerning the company's financial compliance and internal controls inadequate.[220]

have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... all facts [with particularity] on which that belief is formed." *Vantive*, 283 F.3d at 1084–85. The scienter analysis, while equally demanding, requires that the court draw inferences from the facts alleged, even if the fact may have an innocent explanation, and that it then compare the inference to the competing explanation to determine if plaintiffs had adequately alleged a strong inference of knowledge or deliberate recklessness. As noted above, the Deloitte resignation fails to raise a strong inference that is " 'more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.' " *Glazer Capital*, 549 F.3d at 743 (quoting *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499).

218. In this regard, the court notes, without accepting the truth of the statement, that American Apparel's December 21, 2010, Form 8–K reported that "[m]anagement ... [did] not believe that the February 2010 monthly financial statements were withheld." (American Apparel Reply RJN, Exh. 28 at 7.) The Form 8–K included a statement from Deloitte, indicating its disagreement with the company's assertion, and reporting that it

"believe[d] [it] requested the February 2010 financial information prior to issuing [its] reports and that management informed [the auditor] that such information was not available." (*Id.* at 11.)

219. American Apparel RJN; Exh. 16 at 76.

220. Allegations that American Apparel is currently being investigated do not support an inference that Charney and Kowalewski knew or deliberately and recklessly disregarded the falsity of the statements at the time they were made. See *In re Hansen Natural Corp. Securities Litigation*, 527 F.Supp.2d 1142, 1162 (C.D.Cal.2007) ("[T]he mere existence of [an] investigation cannot support any inference of wrongdoing or fraudulent scienter on the part of [a] company or its senior management"). Similarly, the fact that American Apparel had three chief financial officers during the class period does not give rise to an inference of scienter, although it is relevant in conducting a holistic review of plaintiffs' allegation. See *In re McKesson HBOC, Inc. Securities Litigation*, 126 F.Supp.2d 1248, 1275 n. 16 (N.D.Cal.2000); *In re Impax Labs., Inc. Securities Litigation*, No. C04–04802JW, 2007 WL 7022753, *9, 2007 U.S. Dist. LEXIS 52356, *26–27 (N.D.Cal. July 18, 2007) ("when corporate reshuffling occurs in tandem with fi-

### d. Holistic Review of the Facts

■ As noted, even if individual allegations of scienter are not sufficient to give rise to a "strong inference" of knowledge or recklessness, the court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Investment Council*, 641 F.3d at 1095; *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir.2004) ("We find that the totality of the allegations does create a strong inference that Oracle acted with scienter, and we reverse the District Court"). Under this standard, "[v]ague or ambiguous allegations are . . . considered as a part of [the] holistic review . . . [because] the federal courts . . . need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784. In conducting a holistic review, however, "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation."

*Zucco*, 552 F.3d at 1006. As the Supreme Court has instructed, the analysis is a comparative one. *Tellabs*, 551 U.S. at 310, 127 S.Ct. 2499 ("The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff").[221]

Although in this case the whole is indeed greater than the sum of its parts, the facts pled do not give rise to a "strong inference" of scienter that is as compelling as plausible innocent explanations. Plaintiffs paint the picture of a company that was heavily dependent on a work force that management had reason to believe was drawn heavily from Los Angeles's large undocumented population. The company was led by Charney, a charismatic and sometimes mercurial figure who took strong stances on immigration reform and seemed well aware that many companies in the garment industry employed ineligible workers. Charney

---

nancial restatements, these changes 'add one more piece to the scienter puzzle' ").

**221.** The complaint alleges three "additional indicia of scienter"—(1) that Charney used American Apparel as a "vehicle to enrich himself and his family, at the expense of shareholders" (Complaint, ¶¶ 155–59); (2) that Charney used his bloc of 52% of the company's shares to guarantee the outcome of all shareholder proxy votes (*Id.*, ¶¶ 160–66); and (3) that Charney and Kowalewski repeatedly signed off on the company's allegedly false Sarbanes–Oxley certifications and financial statements prepared in violation of GAAP (*id.* at 167–70).

Plaintiffs no doubt knew that these allegations would be insufficient to support an allegation of scienter, viewed independently, as the first two "indicia" do not allege that Char-

ney behaved deceptively in any way, and the last relies completely on the complaint's central allegations of falsity, which the court has found to be inadequately pled. Furthermore, signing Sarbanes–Oxley certifications on SEC forms, without more, has been held to be insufficient to plead scienter. *Zucco*, 552 F.3d at 1003–04 ("Boilerplate language in a corporation's 10–K form, or required certifications under Sarbanes–Oxley section 302(a), however, add nothing substantial to the scienter calculus"). Nor does "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, . . . establish scienter." *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir.2002). The court therefore declines to conduct an individualized analysis of the "additional indicia" of scienter. It does, however, consider them in assessing plaintiff's allegations holistically.

exercised significant control over the company's operations before it went public, and although he professed a desire to bring the company's financial controls in line with legal requirements, he hired an inexperienced and underqualified chief financial officer to oversee a complicated operation. He continued to exert strong control over the company even after it went public, through his majority ownership. The company, and Charney and Kowalewski in particular, repeatedly assured investors that American Apparel was healthy and financially viable, even after an ICE investigation led to the termination of 1,500 workers in the Fall of 2009. The company continued to offer an optimistic picture of its prospects, when statements mad by Charney at an earlier time suggest he knew full well that losing such a large percentage of his employees would have an immediate negative effect on its bottom line. Subsequently, the company walked back its optimism, and acknowledged during investor and earnings calls throughout 2010 that the work force reduction had severely crippled its operations, leading to a massive decline in profitability and the potential for default. As these disclosures were being made, the company's well-respected independent auditor resigned, citing its inability to rely on management's representations.

Were plaintiffs' view of what occurred supported by sufficient facts, the court would find it as compelling as any innocent explanation of events, and deny defendants' motions to dismiss. Plaintiffs allege no facts indicating that defendants had contemporaneous knowledge their statements were false. Their repeated pleading of vague and forward-looking statements and their comparison of those statements with what eventually occurred does not suffice to plead scienter. Plaintiffs' allegations ask the court to assume that defendants "must have known" given what ultimately transpired. Plaintiffs

omit key words from documents or statements they quote, and take other statements out of context to suggest that defendants were making false representations. While the allegations would most likely support a finding of negligence, this is not the equivalent of scienter.

Taken as a whole, therefore, the court finds that plaintiffs' allegations do not give rise to a "strong inference" that, at the time the allegedly false statements were made, defendants knew they were false, or deliberately and recklessly disregarded the likelihood that they were false. *South Ferry LP # 2 v. Killinger*, 687 F.Supp.2d 1248, 1254 (W.D.Wash.2009) ("[T]he PSLRA demands 'particular allegations which strongly imply Defendants' *contemporaneous* knowledge that the statement was false when made,'" quoting *Berson*, 527 F.3d at 989 (emphasis in original)).

### e. Conclusion Regarding Scienter

In pleading scienter, "[t]he requisite recklessness must be an 'extreme departure from the standards of ordinary care, and ... present[ ] a danger of misleading buyers that is either known to the defendant or so obvious that the actor must have been aware of it.'" *Middlesex Retirement System*, 527 F.Supp.2d at 1179 (quoting *Silicon Graphics*, 183 F.3d at 984). Plaintiffs have failed to satisfy this stringent pleading standard, and defendants' motion to dismiss must be granted on this basis as well. The court grants plaintiffs leave to amend.

### G. Sufficiency of Count II: Violation of Section 20(a) of the 1934 Act

Section 20(a) imposes joint and several liability on persons who directly or indirectly control a violator of the securities laws. The section provides:

"Every person who, directly or indirectly, controls any person liable under any

provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person ... is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

 A *prima facie* case of control person liability requires evidence (1) that a primary violation of the securities laws occurred and (2) that defendant directly or indirectly controlled the person or entity committing the primary violation. See, e.g., *Howard v. Everex Systems, Inc.*, 228

F.3d 1057, 1065 (9th Cir.2000); *Paracor Finance*, 96 F.3d at 1161. Plaintiffs need not prove the individual defendant's scienter or "culpable participation" in the alleged wrongdoing. *Id.* (quoting *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir.1993)). "Section 20(a) claims may be dismissed summarily ... [however,] if a plaintiff fails to adequately plead a primary violation of section 10(b)." *Zucco*, 552 F.3d at 990. Because the court has dismissed plaintiffs' section 10(b) and Rule 10b–5 claims, there is no primary violation on which to predicate section 20(a) liability. Consequently, the court dismisses plaintiffs' Section 20(a) claim.[222]

**222.** Since plaintiffs have failed to allege a primary violation adequately, the court cannot conclusively address control person liability. Defendant Lion Capital's arguments regarding control person liability bear some mention, however. Lion Capital argues that plaintiff has failed to plead that has control person liability based on its relationship with American Apparel, and that the court should dismiss the claims against it without leave to amend. (Lion Capital MTD. at 6–10.) Plaintiffs allege that Lion Capital is a control person because (1) it had a significant lending relationship with American Apparel; (2) two of Lion Capital's directors were members of American Apparel's nine-person board; (3) the financing agreement between the two companies gave Lion Capital the right to appoint a "Board Observer"; and (4) the agreement gave Lion Capital power to exercise warrants that would have "diluted Charney's American Apparel equity stake from a majority to a non-majority stock owner." (Complaint, ¶ 188.)

Lion Capital asserts that to allege the "control" element, plaintiffs "must plead ... that defendants exercised 'a significant degree of day-to-day operational control, amounting to the power to dictate another party's conduct or operations.' " *In re McKesson HBOC Secs. Litig.*, 126 F.Supp.2d 1248, 1277 (N.D.Cal. 2000); see also *Lilley v. Charren*, 936 F.Supp. 708, 716 (N.D.Cal.1996) ("[P]laintiffs must allege facts showing that each defendant possessed the actual power to control the person primarily liable"). Lion Capital notes that lenders are generally not treated as "control

persons" under the securities laws. See *Paracor Finance*, 96 F.3d at 1162 (courts "have been very reluctant to treat lenders as controlling persons of their borrowers"). It also asserts that having representatives on a company's board and holding a minority stock interest are insufficient to establish control person liability. See *In re Gupta Corp. Securities Litigation*, 900 F.Supp. 1217, 1243 (N.D.Cal.1994) (defendant's "position as a minority shareholder ... with an agent on the board does not establish control person liability"); *O'Sullivan v. Trident Microsystems*, No. C 93–20621 RMW (EAI), 1994 WL 124453, *18 (N.D.Cal. Jan. 31, 1994) (owning 9.5% of a defendant's stock and having a representative on the board were insufficient to state a claim for control person liability).

Control person liability, however, is "an intensely factual question." *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir.2000). Plaintiffs' allegations may not plead liability taken individually, but they may amount to control person liability in the aggregate. See *Batwin v. Occam Networks, Inc.*, No. CV 07–2750 CAS (SHx), 2008 WL 2676364, *25 (C.D.Cal. Jul. 1, 2008) (" 'The traditional indicia of control are: having a prior lending relationship, owning stock in the target company, or having a seat on the board,' " quoting *In re Surebeam Corp. Securities Litigation*, No. 03 CV 1721JM(POR), 2005 WL 5036360, *25 (S.D.Cal. Jan. 3, 2005)). Given its dismissal of the primary violation claims, the court need not assess the adequacy of plaintiffs' allegations against Lion Capital at this time. None of Lion Capi-

## III. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted. Plaintiffs may file an amended complaint within forty-five (45) days of the date of this order.

In *Matrixx*, the Supreme Court affirmed a Ninth Circuit decision that explicitly used the two-step approach in deciding that plaintiffs had successfully pled scienter. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1180 (9th Cir.2009) ("We must first 'determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter.' If not, we are to 'conduct a "holistic" review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness,'" citing *Zucco*, 552 F.3d at 992). The Supreme Court did not disapprove or even mention the circuit court's test. It simply "conclude[d], in agreement with the Court of Appeals, that respondents ha[d] adequately pleaded scienter." *Matrixx*, 131 S.Ct. at 1324. Given that *Matrixx* relied on *Tellabs*, and given that the Ninth Circuit in *Zucco* adhered to the two-step analysis while acknowledging the *Tellabs* holding, the court concludes that it continues to adhere to its earlier methodology.

tal's arguments convince the court that it should dismiss the control person claim against it without leave to amend, and the court presumes that plaintiffs will consider those arguments, and the case law cited, in pleading the claim in any amended complaint.

One of Lion Capital's arguments has particular merit, however. Since Lion Capital's alleged control of American Apparel began in March 2009–in the middle of the class period it can be held liable only for misrepresenta-tions and omissions made after that time. *See Teamsters Local 617 Pension and Welfare Funds v. Apollo Group, Inc.*, 690 F.Supp.2d 959, 979 (D.Ariz.2010) ("First, the court agrees with [defendant's] assertion that 'officers and directors' cannot be found 'liable as control persons under Section 20(a) for alleged violations that took place before they assumed their positions'"). The court directs plaintiffs to amend this aspect of their claim against Lion Capital in any amended complaint.